DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellants, Dorothy D. and Christopher D., each appeal from the judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed E.T., C.D., and Cr.D. in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms the termination of parental rights as to Christopher, and reverses and remands the decision of the trial court as to Dorothy, in accordance with the following opinion.
 {¶ 2} Dorothy is the mother of three children: E.T., born May 6, 1997; C.D., born July 19, 2002; and Cr.D., born April 14, 2004. Christopher was found to be the biological father of C.D. based on genetic testing, and was presumed to be the father of Cr.D. by virtue of his marriage to Dorothy. See R.C.3111.03(A)(1). Another man, Terrell Cook, was alleged to be the biological father of E.T. Cook did not participate in the permanent custody hearing below, and is not a party to the present appeal.
 {¶ 3} The two older children were removed from the home as a result of incidents occurring on October 23, 2003. On that day, Christopher went to pick up E.T. from school and learned that E.T. had been misbehaving. Once at home, Christopher told Dorothy that he intended to spank E.T. because of her behavior. According to Dorothy, Christopher had occasionally spanked E.T. before, using his hand and not severely. Dorothy told him she had a migraine headache and left the home to take a walk, as her doctor had recommended she do when she got a migraine. Fifteen to twenty minutes later, Christopher, E.T., and C.D. caught up to Dorothy on her walk. E.T. was playing with Christopher, while he pushed C.D. in a stroller. E.T. approached her mother and complained that her leg hurt. She said that Christopher spanked her with a belt. According to Dorothy, they talked, and E.T. willingly continued on the walk and to dinner. Later that evening, Dorothy observed welts and swelling on the child's thigh and buttocks. Dorothy applied ice packs, and called her own mother for advice. The next morning the welts were reduced in size and Dorothy sent E.T. to school. That day, school officials observed bruises on E.T. and contacted CSB. Based on this incident, E.T. and C.D. were removed from the home by the Akron police pursuant to Juv.R. 6.
 {¶ 4} On October 27, 2003, CSB filed a complaint, alleging that E.T. was abused, neglected, dependent, and endangered, and that C.D. was dependent. Following a hearing, emergency temporary custody was granted to CSB as to both children. On December 12, 2003, the trial court found E.T. to be abused, neglected, and dependent, and found C.D. to be dependent. On January 14, 2004, Dorothy and Christopher agreed to a dispositional order placing the children in the temporary custody of CSB and to the adoption of the case plan.
 {¶ 5} As a result of his actions on October 23, 2003, Christopher was arrested for child endangerment on February 28, 2004. He was convicted of the same charge and was sentenced to 180 days incarceration, with 90 days suspended. He also spent some time in Oriana House and was released on June 16, 2004.
 {¶ 6} A third child, Cr.D., was born to the couple on April 14, 2004 and she was taken into custody by CSB two days later. The trial court subsequently found Cr.D. to be a dependent child and placed her in the temporary custody of CSB.
 {¶ 7} On September 8, 2004, CSB moved for permanent custody of all three children. For their part, Dorothy and Christopher moved for a six-month extension of temporary custody. A lengthy hearing on both motions took place over five days in March and April 2005. On May 2, 2005, the trial court denied the motion for a six-month extension, and granted CSB's motion for permanent custody, terminating the parental rights of Dorothy, Christopher, and Cook.
 {¶ 8} Dorothy and Christopher each appealed from that decision. On November 16, 2005, this Court found that the trial court erroneously concluded that two of the children had been in the temporary custody of CSB for 12 of the 22 months prior to the filing of the motion for permanent custody. See In re E.T., 9th Dist. No. 22720, 2005-Ohio-6087, at ¶ 12. This Court found that the trial court erred when it relied on this faulty conclusion in denying a motion for an extension of temporary custody as to all the children, and also erred in determining that the first prong of the permanent custody test was satisfied thereby as to E.T. and C.D. Id. at ¶ 11-12. See R.C. 2151.414(B)(1)(d). The matter was reversed for further proceedings. See In re E.T.,2005-Ohio-6987, at ¶ 16.
 {¶ 9} Upon remand, the trial court entered a new order, specifically finding that all three children could not or should not be returned to the parents, one of the four alternative findings necessary to satisfy the first prong of the permanent custody test. See R.C. 2151.414(B)(1). The trial court cited R.C.2151.414(E)(1) in support of its finding. The court also found that it was in the best interests of the children that CSB be granted permanent custody. The trial court, therefore, granted CSB's motion for permanent custody and terminated the parental rights of Dorothy and Christopher. Dorothy and Christopher have each again timely appealed, and have filed separate appellate briefs. Dorothy has assigned three assignments of error for review and Christopher has assigned four. Dorothy's three assignments of error and Christopher's first three assignments of error will be combined for ease of discussion.
 DOROTHY'S ASSIGNMENT OF ERROR I
"The trial court's decision terminating appellant-mother's parental rights was not supported by clear and convincing evidence and was against the manifest weight of the evidence."
 CHRISTOPHER'S ASSIGNMENT OF ERROR II
"The trial court's decision terminating appellant-father's parental rights was not supported by clear and convincing evidence and was against the manifest weight of the evidence."
 DOROTHY'S ASSIGNMENT OF ERROR II
"The trial court's decision denying the motion for six month extension of temporary custody was not supported by clear and convincing evidence and was against the manifest weight of the evidence."
 CHRISTOPHER'S ASSIGNMENT OF ERROR I
"The trial court erred in not permitting hearings upon remand and in not granting appellant a six month extension of temporary custody followed by a new trial if necessary."
 DOROTHY'S ASSIGNMENT OF ERROR III
"The trial court erred in granting permanent custody and in denying [Dorothy's] motion to vacate prior findings of reasonable efforts where CSB failed to use reasonable efforts to reunite [Dorothy] and her children."
 CHRISTOPHER'S ASSIGNMENT OF ERROR III
"The trial court erred in granting permanent custody and in denying appellant-father's motion to vacate prior findings of reasonable efforts where CSB failed to use reasonable efforts to reunite appellant-father and his minor children."
 {¶ 10} Dorothy and Christopher each argue that the trial court's decision to place the children in the permanent custody of CSB was against the manifest weight of the evidence and that the trial court should, instead, have granted them a six-month extension of temporary custody.[1] They also contend that CSB failed to use reasonable efforts to reunite the family, and that the trial court erred in denying their motion to vacate prior findings of reasonable efforts.
 {¶ 11} This Court concludes that the weight of the evidence supports the termination of parental rights of Christopher, but fails to support the termination of parental rights of Dorothy, and further concludes that the trial court should have granted Dorothy's motion for a six-month extension. We find no error in the trial court's denial of the appellants' motion to vacate prior findings of reasonable efforts by CSB.
 {¶ 12} Before a juvenile court can terminate parental rights and award permanent custody of a child to a proper moving agency, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C.2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 13} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "`The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" (Alterations sic). Id., quoting State v.Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v.Martin (1983), 20 Ohio App.3d 172, 175.
Children could not or should not be placed with either parent
 {¶ 14} The trial court found that the first prong of the permanent custody test was satisfied because the children could not or should not be placed with either parent within a reasonable time. R.C. 2151.414(B)(1)(a). In making such a determination, the trial court must consider the factors enumerated in R.C. 2151.414(E). In this case, the court found R.C. 2151.414(E)(1) to be applicable. That section provides in pertinent part:
"Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."
When the trial court determines that one of the factors in R.C.2151.414(E) exists as to each of the children's parents, it must enter a finding that the children could not or should not be placed with either parent within a reasonable time. R.C.2151.414(E).
 {¶ 15} In challenging the assertion that the children could not or should not be placed with either parent within a reasonable time, Christopher and Dorothy each contend that CSB failed to provide them with reasonable case planning and diligent efforts as required by R.C. 2151.414(E)(1). Furthermore, assuming CSB did provide reasonable case planning and diligent efforts, Christopher and Dorothy each argue that they did not continuously and repeatedly fail to substantially remedy the conditions that led to the removal of the children. Rather, they suggest that they had been making progress towards reunification.
Reasonable case planning and diligent efforts and reasonableefforts toward reunification
 {¶ 16} We now consider the contention that CSB failed to provide reasonable case planning and diligent efforts as required by R.C. 2151.414(E)(1), and the substantively related argument that the trial court should have granted the parents' motion to vacate the prior finding that CSB had made reasonable efforts to reunify the family. Because we find that Dorothy has not failed to substantially remedy the conditions causing the children to be placed outside the home, these arguments are moot as to her. See App. R. 12(A)(1)(c). We address them only as to Christopher.
 {¶ 17} Where the trial court has relied solely upon R.C.2151.414(E)(1) in satisfaction of the first prong of the permanent custody test, as here, the trial court is required to find that the child cannot or should not be returned to either parent because the parent failed to substantially remedy the conditions causing the child to be placed outside the home "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents[.]" See In the Matter of Ward
(Aug. 2, 2000), 4th Dist. No. 99CA2677, citing with approval Inre Scott (Sept. 17, 1999), 6th Dist. No. L-99-1012 ("`Absent any evidence of agency efforts [toward] reunification after the children's removal from the home, an R.C. 2151.414(E)(1) predicate finding cannot be sustained.'") "If an agency chooses to argue that the parent did not rectify the cause(s) for removal, then the parent must have an opportunity to do so."Ward, supra.
 {¶ 18} In addition, CSB was required to prove that it put forth reasonable efforts toward reunification. R.C. 2151.419(A) explicitly requires the agency to establish that it has made reasonable efforts toward reunification or to prevent the continued removal of the child from the home "at any hearing held pursuant to section 2151.28 [shelter care], division (E) of section 2151.31 [ex parte emergency temporary custody], or section 2151.314 [shelter care placement], 2151.33 [pre-adjudication temporary placement], or 2151.353 [initial disposition following adjudication] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]" See In re K.H.,
9th Dist. No. 22765, 2005-Ohio-6323, at ¶ 9. When considering whether an agency made reasonable efforts to prevent the removal of children from a home, the issue is not whether the agency could have done more, but whether it did enough to satisfy the reasonableness standard under the statute. In re Elliott, 7th Dist. Nos. 03JE30, 03JE33, 2004-Ohio-388, at ¶ 40.
 {¶ 19} Christopher brings several complaints regarding the case planning done on his behalf. First, he complains that Karla McDay, the first caseworker assigned to this case, was inexperienced as to case planning and involvement in court hearings, and that she prepared the original case plan without the participation of the parents. McDay was assigned as a temporary case worker during a work stoppage, but McDay was not unqualified. She was the CSB supervisor of the independent living program, has a master's degree in social work, and is a licensed social worker. The record indicates that McDay presented the original case plan to the parents, and both parents signed the case plan as having participated in it and having agreed with it. McDay testified that the parents were committed to working on the case plan at that time. Dorothy, in fact, commended McDay for her frequent communication and helpful efforts. Based on the record before this Court, we cannot conclude that McDay's inexperience constituted a lack of reasonable case planning and diligent efforts, or a lack of reasonable efforts.
 {¶ 20} Second, Christopher complains that Tammy Dillon, the second case worker assigned to this case, did not maintain satisfactory contact or provide satisfactory services. As found by the trial judge, Dillon made numerous contacts to verify services were provided as referred, and was in frequent contact with the guardian ad litem regarding the children's needs. She spoke with Dorothy several times, but Christopher was often unavailable. Caseworker Dillon testified that she attempted to return telephone calls, but that the parents were often difficult to reach. The parents changed their telephone from a hard line to a cell phone, at one point. Also, after Christopher's release from prison, he had no telephone or address. Dillon did not make many home visits, but the children were not in the home. She met with the parents at the court house, at the visitation center, at family team meetings, and offered to meet with them at other times, but the parents were not willing — according to caseworker Dillon. The record does not support a claim of error on this point.
 {¶ 21} Third, Christopher complains that Dillon failed to make additions to the case plan after his realization that he had been abused as a child. Christopher fails, though, to indicate how the case plan would have been amended beyond the existing requirements that he attend parenting classes, counseling, and anger management treatment. The fact that his counseling might take a longer period of time does not require an amendment to the case plan by the caseworker — nor does it require that the children wait for him.
 {¶ 22} Fourth, Christopher complains that his case plan was amended several times, and that caseworker Dillon added two components to his case plan: housing and employment, without discussing the additions with him first. He contends that the caseworker is required to discuss changes to the case plan with the parents and reach an agreement before filing. R.C.2151.412(D) requires the caseworker to "attempt to obtain an agreement among all parties" regarding the content of a case plan. If agreement is not reached, disputes may be settled in a hearing before the trial court. Id. The amended case plan, which included housing and employment, was adopted by the trial court. It should be noted that most of the amendments to the original case plan were not substantive amendments affecting Christopher — they incorporated the birth of baby Cr.D., added counseling for E.T., changed the case plan expiration dates, separated the goals of the parents, or affected Dorothy's case plan obligations. The additions of housing and employment to Christopher's case plan were not nearly as critical to the decision in this case as Christopher's failings in regard to parenting skills, counseling, and anger management, as discussed below.
 {¶ 23} Christopher also complains that he was not allowed "the full 12 months" to demonstrate his ability to make progress on the case plan. This complaint is without merit. Unless an agency is relying on R.C. 2151.414(B)(1)(d), the "12 out of 22" provision, in satisfaction of the first prong of the permanent custody test, the agency is not obligated to wait a full 12 months before filing a motion for permanent custody. See R.C.2151.414(B)(1)(d).
 {¶ 24} Christopher has failed to demonstrate that CSB did not make reasonable efforts in case planning and diligent efforts toward reunification, or that the trial court erred in denying his motion to vacate the finding of reasonable efforts.
Whether the parents continuously and repeatedly failed tosubstantially remedy problems
 {¶ 25} For purposes of review, we will consider the evidence in regard to each parent separately. We first consider the evidence as to Christopher's efforts to substantially remedy the conditions that led to the removal of the children.
Christopher's efforts
 {¶ 26} Christopher's original case plan required Christopher to participate in parenting classes, individual and couples counseling, and anger management. According to the record before this Court, Christopher consented to the adoption of the case plan at the dispositional hearing in January 2004.
 {¶ 27} Caseworker McDay referred Christopher to the Northeast Ohio Behavioral Health Association for a parenting assessment. Anne Hickin, retired psychologist from that agency, testified regarding her assessment of Christopher conducted in June 2004. His intelligence test revealed average functioning, meaning that he should be able to learn parenting skills and apply what he had learned. Christopher's mental status examination revealed poor planning skills, that he tended to minimize behaviors, and that he blamed others for his difficulties. Hickin concluded that Christopher does not have very good insight, has unrealistic plans, and looks at life in a juvenile way.
 {¶ 28} Hickin expressed concern that Christopher could act on his anger again if he failed to get appropriate treatment. Hickin recommended that Christopher pursue counseling on personality issues, join an anger management group, and pursue marital counseling if he and Dorothy stayed together. Hickin expressed a strong belief that Christopher should not be reunited with the children until he demonstrates changes in anger management and on personality issues.
 {¶ 29} Christopher was also referred to St. Joseph's Parenting Center, where he attended a 26-week program of parenting classes. Catherine Klie, the Executive Director of the program, stated that the parents — collectively — had consistent attendance, were punctual, were properly dressed, and willingly participated. Specifically as to Christopher, however, she testified that he "clown[s] around" in class and she has had to tell him to "pay attention" and "act like an adult." On March 10, 2004, she told the CSB caseworker that Christopher was immature and lacked self-motivation.
 {¶ 30} Director Klie explained that the program includes shaken-baby and child abuse material within its anger management lessons. Following those lessons, there was a picnic for parents and children at which Klie observed Christopher engage in dangerous play with his children, by rolling a cylinder too fast, and violate the shaken-baby guidelines, by tossing C.D. up in the air. At the conclusion of the 26 weeks, she believed the parents — collectively again — had not gotten much out of class.
 {¶ 31} Shortly after his release from Oriana House on June 16, 2004, Christopher visited the children at the home of the maternal grandmother, in violation of his case plan. (Based on the wishes of the maternal grandparents, Christopher was permitted only to have supervised visitation at the visitation center.) While Christopher was at the home, E.T. claimed that Christopher hit her with a ruler. Christopher denied striking her. Caseworker Dillon testified that this event caused her to move E.T. and C.D. from their relative placement to foster homes.
 {¶ 32} Then, on January 18, 2005, Christopher was arrested for domestic violence following an argument with Dorothy. Notwithstanding the fact that he and Dorothy both stated that their argument was completely verbal, Christopher entered a plea of guilty. He received a sentence of probation.
 {¶ 33} For the counseling component of his case plan, Christopher was referred to the Greenleaf Family Center for a diagnostic assessment, counseling, and anger management treatment. Clinical counselor Sheron Henry-Smith testified that in April 2004, she diagnosed Christopher with immediate explosive disorder, which means that Christopher tends to react to situations with much more verbal and physical aggression than the typical person in similar situations does.[2] She counseled him bi-weekly from April until June, and then again from September until January. She counseled Dorothy and Christopher in couples counseling on alternate weeks.
 {¶ 34} Henry-Smith testified that she had been counseling Christopher individually in anger management, but that he was not yet ready to progress to group sessions. She stated that Christopher had difficulty implementing the concepts of anger management on a daily basis, or even in role-playing during his individual sessions with her. At the time of the permanent custody hearing, Henry-Smith did not believe it would be safe for the children to be returned to him. She stated that Christopher would likely need years of counseling.
 {¶ 35} Cheryl King, a social worker at Child Guidance and Family Solutions Center, testified regarding her counseling of E.T. She found that E.T. had symptoms of attention deficit hyperactivity disorder ("ADHD") and presented challenging behaviors, including being noncompliant, oppositional, insubordinate, and demonstrating poor social skills. E.T. was doing better on ADHD medications, but King also believed that some of the child's behavior could stem from her removal from the home. King said it would be difficult for someone with explosive disorder, such as Christopher has, to deal with E.T.'s behaviors.
 {¶ 36} Two CSB aides testified regarding their supervision of visitation at the CSB visitation center. Carli Oswald supervised six visits, and Rubye Boone, an aide with 27 years of experience, supervised most of the rest of the sessions. Oswald testified that she observed Christopher take toys away from C.D., causing him to cry, scream, and get agitated. Christopher contended he took the toys because C.D. had taken the toys from other children. However, Oswald said it appeared to her that Christopher took the toys for no reason. On other occasions, C.D. would bring toys to Christopher, wanting him to hold them, but Christopher would drop them, causing C.D. to become agitated again. Oswald had to correct him repeatedly.
 {¶ 37} CSB aide Boone testified similarly that Christopher was very aggressive in his play with C.D. and agitated him repeatedly. She stated that Christopher did not seem to understand what was appropriate for a child his age.
 {¶ 38} Finally, the guardian ad litem said E.T. told her that Christopher was "mean."
 {¶ 39} In sum, Christopher, who admitted causing the incident which resulted in the removal of the children, has convictions for child endangering and domestic violence, did not benefit from his parenting class, demonstrated inappropriate behavior when he was interacting with the children, made insufficient progress in anger management, is not ready to be reunited with the children, and may have years of counseling ahead of him.
 {¶ 40} The record supports a conclusion that the children could not be placed with Christopher in a reasonable time or should not be placed with him. Dorothy's efforts
 {¶ 41} We next consider the evidence as to Dorothy regarding her efforts to substantially remedy the conditions that led to the removal of the children. Dorothy also participated in a parenting evaluation with Anne Hickin. Hickin reported that Dorothy had a short attention span, but was able to pay attention and respond with a thoughtful tone. Her memory was intact. She copes, Hickin said, by use of denial and blaming other people. Her intelligence test revealed a "borderline" level of intellectual ability, suggesting some difficulty synthesizing new ideas and applying what she knows to real life situations. The psychopathology test revealed no severe pathology. Hickin recommended that Dorothy continue in counseling, particularly to learn new coping skills, and in marital counseling, if she stayed in her marriage.
 {¶ 42} CSB referred Dorothy to St. Joseph's Parenting Center, where she attended a series of 26 two-hour parenting classes.[3] Catherine Klie, the Executive Director, testified regarding Dorothy's participation.[4] While she stated generally that the parents — collectively — had not gotten much out of the class, and made several negative comments about Christopher, she offered no criticism of Dorothy as to her participation in the program or her behavior with the children during the agency picnic for parents and children.
 {¶ 43} For her counseling, Dorothy participated in two separate mental health assessments at Greenleaf. Both assessments resulted in the same diagnosis: adjustment disorder, stemming from the stress of the removal of her children. The diagnosed disorder was said to perhaps be symptom driven and could be eradicated by the return of the children. James Athans, Ph.D. testified that Dorothy was cooperative, motivated, and concerned about her children. Greg Markovich testified that a large majority of the population can have adjustment disorder and not receive treatment. Markovich said he believed Dorothy was of average intelligence, but if he had known that Dorothy was of below-average intelligence, he would have changed his procedures. Markovich anticipated working on Dorothy's marriage, employment issues, and self esteem. Markovich did not believe his five sessions with Dorothy completed the objectives.
 {¶ 44} Dorothy also participated in couples counseling with Sheron HenryS-mith. While Henry-Smith indicated that Christopher would need years of counseling, she cited no significant specific problems for Dorothy.
 {¶ 45} Dorothy had left Greenleaf because her grant money had run out and she could not afford to attend counseling there. Instead, on her own, she found and participated in free counseling offered by students at the University of Akron. After completing six weeks there, she received a signed certificate explaining what she had completed. Dillon confirmed that the counselors at the university had worked on stress management and breathing techniques with Dorothy. Caseworker Dillon testified that she did not approve of the university as an acceptable site for counseling because she did not believe students were capable of helping these parents. Counselor Sheron Henry-Smith disagreed, testifying that such counseling would be satisfactory for Dorothy because her needs were not as serious as those of Christopher. Dillon interpreted Dorothy's behavior in attending counseling at a site not approved by her as being uncooperative.
 {¶ 46} The same two case aides also observed Dorothy during visitations. Carli Oswald testified that upon arrival at the center, there would be affectionate hugs and the children reacted with excitement. They would smile and laugh. Unlike her negative comments regarding Christopher, Oswald specifically indicated that she had no concerns with Dorothy's behavior or parenting during visitations. Dorothy was said to be appropriate as she fed Cr.D. and played with the older children.
 {¶ 47} Rubye Boone testified that the parents consistently attended visitations. She agreed that the children know their parents and are glad to see them when they arrive. They play games as a family and talk in general conversation. She said that E.T. is very strong-willed and can be very stubborn, but that Dorothy does well with her. She talks to E.T. and tries to reason with her. She is calm with all the children and repeats herself so that they understand her. She noted that Dorothy frequently has to redirect Christopher and remind him as to certain behaviors, such as time-outs, not to agitate C.D., and to keep the children in the play area.
 {¶ 48} Kimberly Nelson, the guardian ad litem, testified that E.T. is very close to her mother and would want to return home with her. Cheryl King, E.T.'s counselor, also said the child expressed a wish to return home. King testified that E.T. needs a structured, nurturing home with consistent limits and adequate and appropriate discipline — more than the average child. She does not require an extraordinary caretaker, just an "on-top-of-it" person.
 {¶ 49} The director of the parenting program said that her only concerns regarding Dorothy had been regarding employment, education, and housing. Those concerns largely coincide with routine additions to the case plan by caseworker Tammy Dillon. We do not find such concerns to be dispositive of the issues in this case, however.
 {¶ 50} As to housing, Dorothy had maintained stable housing for several years. Dillon admitted that there really was no referral needed for housing, as they just needed to maintain it. She believed, however, that Dorothy would not able to maintain her current subsidized housing if Christopher remained with her because of his convictions or if the children were placed outside the home. Dorothy has maintained the home for a year since the children were removed and has not permitted Christopher to live there on a permanent basis. Dorothy's apartment was always maintained in her name alone. Dillon never made any complaints as to the adequacy, cleanliness, or safety of Dorothy's housing, nor was there any criticism regarding food, clothing, or school attendance by the children.
 {¶ 51} As to employment, the record indicates that Dorothy worked for a month and one-half at a temporary agency, packing light bulbs, after the children were removed. She left the job because her case worker, Tammy Dillon, deemed the job unacceptable as it did not provide a regular pay check. Dorothy then took a job at Taco Bell, but left after three months because of "racist issues." Since then, she has been attending visitation and services required by her case plan, and attempting to find another job. She said she finds most of her interviews through the internet on her own computer. Dillon referred the parents to the Department of Human Services and St. Joseph's Parenting Center for help with employment as well as the phone book, the newspaper, and "anybody that had a sign hanging in the window that said `help wanted.'"
 {¶ 52} Dorothy attended school through the eleventh grade, and was urged by the director of the parenting program to obtain her high school equivalency degree. While that may be commendable, this Court has recognized that it is not a necessary step in order to provide and care for one's children. In reM.W., 9th Dist. No. 03CA008342, 2004-Ohio-438, at ¶ 28. Director Klie was not aware that Dorothy had enrolled in the Ohio Distance and Electronic Learning Academy ("OHDELA"). Dorothy testified that she had to withdraw at the age of 22, because of an age limitation, and promptly enrolled in another program. There was no evidence disputing this testimony.
 {¶ 53} Dillon's reasons for removing baby Cr.D. at two days of age were that Dorothy had not obtained pre-natal care, there was a lack of case plan compliance, and Dorothy was unable to ensure the safety of the newborn. Dorothy testified that she did obtain pre-natal care. She had merely stopped going to her regular obstetrician because she learned that he had been sued for malpractice in regard to an infant. Instead, she sought medical attention at the Women's Health Center, and had, by all accounts, a healthy baby. In addition, Dorothy had a pediatrician for the children and there is no evidence disputing her testimony that she took them for regular check-ups. As to case plan compliance, at the time the baby was removed, Dorothy was enrolled in parenting classes and counseling. As to the need to protect the child, Christopher was incarcerated at the time of the baby's birth.
 {¶ 54} Dillon also later added attendance in a domestic violence support group to Dorothy's case plan. Dorothy testified that she attended two or three sessions at Barberton Hospital. Because attendance was confidential, the caseworker could not confirm Dorothy's attendance, however.
 {¶ 55} In sum, there is no evidence that Dorothy ever caused harm to any of her children, or that she was present when Christopher did so. There is no evidence to suggest she knew Christopher was going to discipline E.T. more severely than when he had spanked her in the past. In addition, there was no significant criticism regarding her participation or behavior in parenting classes or during visitations, and only positive statements regarding her handling of even the difficult behavior of E.T. Dorothy's only mental health diagnosis was an adjustment disorder, stemming from the removal of her children. There is no evidence in the record before this Court that Dorothy ever lacked adequate housing for herself or her children. Nor is there any evidence that she was not providing food, regular medical check-ups, or appropriate clothing for her children. Her intelligence may be below average, and she has not always been employed, but she has demonstrated initiative and resourcefulness over the years in consistently maintaining a home and providing food and clothing for her children. Dorothy has testified that she is willing to separate from her husband in order to keep her children. While Dorothy's situation may present challenges, the record fails to clearly and convincingly support a conclusion that the children could not be placed with Dorothy in a reasonable time or should not be placed with her.
Best interests of the children
 {¶ 56} Dorothy and Christopher also challenge the finding on the second prong of the permanent custody test, contending that the trial court's best interest finding was against the manifest weight of the evidence. CSB responds by claiming that the record supports the trial court's finding that it is in the best interests of the children that CSB be granted permanent custody of the children.
 {¶ 57} When determining whether a grant of permanent custody is in a child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
"(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D)(1)-(5).
 {¶ 58} Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors. SeeIn re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at 6; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 59} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoption of Holcomb (1985),18 Ohio St.3d 361, 368, quoting Cross v. Ledford (1954),161 Ohio St. 469, paragraph three of the syllabus.
The interaction and interrelationships of the children
 {¶ 60} The guardian ad litem, Kimberly Nelson, testified that E.T. is very attached and bonded to her mother. Case aide Rubye Boone observed that Dorothy was very good in her handling of E.T., who could be a difficult child. Case aide Carli Oswald had no concerns regarding Dorothy's behavior with any of the children. Her visits with the children were consistent, affectionate, and appropriate.
 {¶ 61} The children's relationship with Christopher was more contentious. E.T. told the guardian ad litem that Christopher was "mean." Both case aides reported that Christopher frequently agitated C.D. when he tried to play with the child, and he was aggressive with the children.
 {¶ 62} Guardian ad litem Kimberly Nelson stated that E.T. had a "serious bond" with her brother C.D., and she likes to see Cr.D. at visits, recognizing her as her baby sister and intermittently helping to take care of her during visitations. C.D. is not very talkative, but, according to the guardian ad litem, expresses a connection to E.T. in that he will walk up and hug E.T., especially trying to comfort her when she is upset. One-year-old C.D. is not terribly involved with baby Cr.D., but will affectionately and appropriately touch her on the head.
 {¶ 63} Dorothy testified generally that the children have a very good relationship with her family and a decent relationship with Christopher's family, though they live out-of-state. No family members testified at the hearing.
 {¶ 64} Caseworker Dillon testified that on the day E.T. was taken from school and into custody, the child was pleasant, cooperative, able to understand, appeared well-developed, displayed age-appropriate behavior, and her clothing was in fine condition. She was already in speech therapy at school. C.D. was removed from the home at the same time. He was also examined and found to be in good health and with no delays. Dillon had expressed concern with a lack of pre-natal care for Cr.D., but Dorothy testified that she had been going to a clinic and eventually gave birth to a healthy, five pound, 12 ounce baby girl. After being in care for nearly a year, E.T. was given a psychological evaluation and presented as demanding and agitated.
 {¶ 65} Caseworker Dillon observed visitation by the parents only once before filing for permanent custody, and three times thereafter. She testified that C.D. was rather distant from Christopher and that the parents were competitive with E.T. when playing games, such as checkers. She claimed that Christopher did not interact with E.T.
The wishes of the children
 {¶ 66} In her testimony, the guardian ad litem explained that seven-year-old E.T. is "very attached and bonded" to her mother and would like to return to her care. Nelson also said that E.T. thinks Christopher is "mean." The guardian ad litem indicated that the two younger children were too young to express their wishes. In her written report to the trial court, the guardian ad litem concluded that all three children should be placed in the permanent custody of CSB.
Custodial history of the children
 {¶ 67} Dorothy gave birth to E.T. while still a minor and lived with her own mother until she was eighteen. At that time, she decided that she needed to be on her own and obtained her own apartment. She remained there for two years, and then got another apartment for two more years. Dorothy met Christopher in 1999 and has lived with him since that time. They married in 2003.
 {¶ 68} E.T. and C.D. lived with Dorothy — and later also with Christopher — from their births until their removal from the home on October 23, 2003, i.e. for six and one-half years and fifteen months respectively.
 {¶ 69} When the two oldest children were removed from the home, they were placed with their maternal grandmother for nine months. When Cr.D. was born, she was immediately placed in foster care. After two weeks, she was placed with the maternal grandfather. On July 16, 2004, all three children were placed in foster care, with the two oldest children together in one foster home and the youngest child placed in a separate foster home. The motion for permanent custody was filed two months later. The children remained in foster care through the first appeal. The record does not indicate any change in placement thereafter.
 {¶ 70} Christopher and Dorothy visited with the children regularly. Dorothy had unlimited unsupervised visitation while the children were placed at the relatives' homes, and also had weekly visitation along with Christopher at the visitation center. The relatives did not want Christopher to visit in their homes, and his visitation was, therefore, limited to supervised visitation at the center.
 {¶ 71} Dorothy testified that she visited with her children once or twice a week at her mother's home. She explained that her mother worked very late sometimes, making it difficult for her to visit, especially since she relied on bus transportation. Caseworker McDay testified that visits were later moved to the visitation center due to those conflicts and because the parents wanted to visit more. Caseworker Dillon, on the other hand, vaguely criticized Dorothy for not taking full advantage of the unlimited visitation at her mother's home. Dillon did not provide any details of the frequency of Dorothy's visits with her children, except to say that Dorothy chose not to stay overnight at her mother's home.
 {¶ 72} CSB asserts that the two oldest children had been in temporary custody for 16 months at the time of the permanent custody hearing, whereas the parents point out that the children had only been away from a relative placement and in foster care for two months before the motion for permanent custody was filed. The trial court found that E.T. and C.D. had been with CSB for 18 months at the last hearing and that the first appeal took another six months. The trial court calculated the portion of the children's lives that they had been in temporary custody.
 {¶ 73} In considering this factor, the trial court, therefore, improperly counted the time involved in the first appeal against the parents. This Court has previously held that the time that is attributable to an appeal of the initial permanent custody order should not be held against parents, as the parents should not be penalized for pursuing their appellate rights. In re C.W., 9th Dist. No. 22820, 2005-Ohio-6739, at ¶ 17. Therefore, it is appropriate to consider that the two older children, seven and two years old at the time of the filing of the motion for permanent custody, had been in temporary custody for 11 months at the time of the filing of the motion, and been placed with a relative for nine of those months. Also, these children had been in temporary custody for 17 months by the time of the hearing on the motion for permanent custody. The youngest child was in temporary custody for most of her life, and was in a relative placement for nearly three of the five months before the motion for permanent custody was filed. She continued in foster care for six additional months until the permanent custody hearing began.
The children's need for a legally secure permanent placementand whether that type of placement can be achieved without agrant of permanent custody to the agency
 {¶ 74} Caseworker Dillon testified that the children are very young and it is not fair to leave them lingering in the system. She believes it is in the best interest of the children to be placed in permanent custody, so that that they may be successfully placed in a permanent home. She stated that there were no suitable relatives willing to take custody of the children. Thus, CSB argues that the evidence supports a finding that the children cannot obtain a legally secure placement unless they are placed in permanent custody.
 {¶ 75} While the evidence supports a finding that Christopher cannot provide a legally secure permanent placement for the children, we conclude that the same cannot be said as to Dorothy. The parties have appealed separately and Dorothy has testified that she would separate from Christopher in order to keep her children. She claims that she and Christopher have not lived together since the incident which resulted in the removal of the children.
 {¶ 76} Based on the record before this Court, we conclude that CSB has failed to present clear and convincing evidence that Dorothy cannot provide a permanent home for her children.
Other factors
 {¶ 77} Finally, the trial court may consider that Christopher was convicted of child endangering in regard to E.T. See R.C.2151.414(E)(7)(c).
 {¶ 78} In conclusion, there was ample evidence to support the conclusion of the trial court that it is not in the children's best interests to be returned to Christopher, but there is no clear and convincing evidence that it is in the best interests of the children to be permanently separated from their mother.
Six-month extension of temporary custody
 {¶ 79} Both parents assert that, upon remand, the trial court erred in failing to grant them a six-month extension of temporary custody so that they could continue working on their case plans.[5] The trial court's decision to grant or deny an extension of temporary custody, however, was a discretionary one. See R.C. 2151.415(D)(1) and (2). Moreover, R.C. 2151.415(D)(1) authorizes the trial court to extend temporary custody for six months only if it finds, by clear and convincing evidence, that such an extension is in the best interests of the children and that "there has been significant progress on the case plan of the [children], and there is reasonable cause to believe that the [children] will be reunified with one of the parents or otherwise permanently placed within the period of extension."
 {¶ 80} Christopher has failed to demonstrate an abuse of discretion by the trial court. The evidence before the trial court reveals that he did not make significant progress on his case plan and there was no reason to believe that he would remedy his parenting problems within the next six months. It cannot be said, however, that Dorothy continued to exhibit any parenting problems related to the reason for the removal of the child. In addition, she had made significant progress on her case plan, and there is reasonable cause to believe that the children could be reunified with her within the period of extension. Consequently, given the evidence before the trial court, it abused its discretion by failing to grant Dorothy six more months to attempt to address her case plan and reunify with her children.
 {¶ 81} In conclusion, therefore, we find that the weight of the evidence supports the termination of the parental rights of Christopher, but fails to support a termination of the parental rights of Dorothy. We further conclude that the trial court erred in denying Dorothy's motion for a six-month extension of temporary custody. Christopher's first three assignments of error are overruled. Dorothy's first and second assignments of error are sustained. Dorothy's third assignment of error is moot.
 CHRISTOPHER'S ASSIGNMENT OF ERROR IV
"Appellant-father was prejudiced by ineffective assistance of counsel."
 {¶ 82} Christopher claims he received ineffective assistance of trial counsel. Specifically, he contends that: (1) he did not have counsel at the first adjudication; (2) his first attorney failed to appear at the shelter care hearing for Cr.D.; (3) his counsel withdrew a motion seeking payment for anger management counseling; and (4) his counsel failed to challenge his case plans and the findings of reasonable efforts on the part of CSB.
 {¶ 83} In order to establish ineffective assistance of counsel, Christopher must demonstrate that his counsel's performance fell below an objective standard of reasonable representation and that he was prejudiced by that performance.State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Furthermore, to demonstrate that he has been prejudiced by counsel's deficient performance, Christopher must also prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different. Id. at paragraph three of the syllabus. There are many ways for an attorney to provide effective assistance in a given case and this Court must give great deference to counsel's performance. Strickland v. Washington (1984), 466 U.S. 668,689. "Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Id.
 {¶ 84} First, Christopher asserts ineffective representation in that he did not have an attorney present at the first adjudication, which took place on December 12, 2003. Christopher requested a continuance to allow for an application for counsel. The trial court indicated that Christopher acknowledged having been timely served with documents and decided not to apply for counsel prior to the hearing. The trial court thus found that Christopher waived his right to counsel.
 {¶ 85} Juvenile court procedures require that one who wishes appointed counsel must complete an affidavit of indigency with the appropriate court employee. See R.C. 2151.314(D). Where an individual has been notified of the procedures to be followed in order to obtain appointed counsel, but fails to make proper and timely application for counsel, as here, there is no denial of the effective assistance of counsel. See In re Careuthers (May 2, 2001), 9th Dist. No. 20272. The argument is without merit.
 {¶ 86} We next consider Christopher's claim of ineffective assistance in regard to the failure of his trial counsel to attend a shelter care hearing for Cr.D, the child born during the course of the proceedings below. The record indicates that Christopher was notified of the hearing and did, in fact, attend the shelter care hearing. The record further demonstrates that Christopher had obtained appointed counsel prior to this hearing.
 {¶ 87} This Court has previously considered the question of lack of counsel at a shelter care hearing. In addressing the question, this Court has indicated that:
"In general, shelter care hearings are directed toward the prompt resolution of emergency custody issues and place primacy on the immediate safety and protection of children. See, generally, Juv.R. 7; R.C. 2151.314. Such hearings are, by the explicit terms of R.C. 2151.314(A), `informal' and permit the consideration of any evidence without regard to the `formal rules of evidence.' Juv.R. 7(F)(3). They are conducted for the purpose of determining whether there was probable cause for the issuance of the emergency order of shelter care and whether the child should remain in shelter care. R.C. 2151.31(E); R.C. 2151.314(B)(1)." Careuthers, supra.
 {¶ 88} The Ohio Supreme Court has also explained that a shelter care decree "is in no sense dispositive; it is interlocutory in nature, limited in scope and purpose, and temporary in duration. It responds to an emergency — the immediate physical needs of the child — until the court can fully inquire into the facts and decide what is best for the child. A shelter care order is no more than this." In re Moloney (1986),24 Ohio St.3d 22, 25.
 {¶ 89} Shelter care orders are matters, therefore, of limited scope and purpose. In his appellate argument, Christopher has failed to assert any prejudice deriving from his lack of counsel at the shelter care hearing. We find this argument to be without merit.
 {¶ 90} Christopher next argues that trial counsel's withdrawal of a motion for payment of anger management counseling constitutes ineffective representation. Christopher's trial counsel first filed a motion seeking payment for anger management counseling, and subsequently took affirmative action and withdrew that motion. When Christopher's trial counsel withdrew the motion, no reason was provided for the withdrawal. Counsel's withdrawal of the motion was apparently, however, a considered action. Therefore, it appears to be a tactical decision within the realm of reasonable professional judgment and fails to establish ineffective assistance of counsel. Debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. See State v. Clayton (1980),62 Ohio St.2d 45, 48-49
 {¶ 91} Last, Christopher contends that his trial counsel was ineffective for failing to challenge his case plan or the reasonable efforts finding by the trial court. Because we find no error regarding the reasonable efforts of CSB, as discussed above, Christopher cannot establish that there exists a reasonable probability that were it not for counsel's errors, the result of the trial would have been different. See Bradley,42 Ohio St.3d 136, at paragraph three of the syllabus.
 {¶ 92} Christopher's fourth assignment of error is without merit.
Conclusion
 {¶ 93} Accordingly, for the reasons set forth in this opinion, we affirm the decision of the juvenile court as it relates to the termination of Christopher's parental rights to C.D. and Cr.D., but reverse such order as it relates to Dorothy's parental rights as to E.T., C.D., and Cr.D. We also reverse the decision of the trial court insofar as it denies Dorothy's motion for a six-month extension of temporary custody.
 {¶ 94} Reversal of the trial court's order terminating Dorothy's parental rights does not mean that physical custody of E.T., C.D., and Cr.D. should immediately be returned to her. CSB may retain physical custody of the children subject to reasonable visitation rights by Dorothy as prescribed by the juvenile court. Based upon the record before us, we urge CSB to work diligently to accomplish reunification of the children with her. However, physical custody should not be returned to Dorothy unless and until the juvenile court determines that the environment in which they will be living creates no reasonably foreseeable risk to the physical or emotional well-being of each of the children.
 {¶ 95} Christopher's four assignments of error are overruled. Dorothy's first and second assignments of error are sustained. Dorothy's third assignment of error is moot.
Judgment affirmed in part, and reversed in part, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs split equally between Appellant, Christopher Daniel, and Appellee.
Moore, J., Boyle, J. concur.
[1] CSB argues that Christopher lacks standing to challenge the trial court's decision regarding E.T., because he is not the biological father of E.T. Through his appellate brief, however, Christopher only appears to be seeking to maintain parental rights as to C.D. and Cr.D. Therefore, the standing question raised by CSB is unfounded as it is based on an incorrect assertion. Dorothy seeks to maintain parental rights as to all three of her biological children. Terrell Cook, the purported father of E.T., has not participated in these proceedings.
[2] Christopher's participation at Greenleaf was interrupted when his grant money ran out and he was not able to afford to continue the sessions. During the period of July to August, he sought counseling at the University of Akron instead, where the student-led sessions were free. Caseworker Dillon testified that she had not approved of counseling at the University of Akron because it was performed by students and was not appropriate, she felt, for the needs of these parents. Henry-Smith agreed in part, testifying that counseling by students would not benefit someone with such a severe diagnosis as Christopher had.
[3] By way of comparison, Pregnancy Care offers six classes in its parenting program and Akron Pregnancy Services offers eight to ten.
[4] As stated above, Klie testified that the parents had consistent attendance, were punctual, were properly dressed, and willingly participated in the program.
[5] Christopher also contends that the trial court erred in not conducting a hearing upon remand. Because Christopher fails to cite any authority for such claim and failed to move the trial court for a hearing when the case was remanded, we find his argument to be without merit.