DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, April R. ("Mother"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights and placed her minor child in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 {¶ 2} Mother is the natural mother of M.R., who was born November 2, 2004, while Mother was still a juvenile.[1]
Because Mother had a history of juvenile delinquency including domestic violence, failing to comply with the conditions of her probation, and repeatedly running away, Mother had been placed in a secure juvenile detention facility prior to M.R.'s birth. M.R. was placed in the custody of CSB shortly after her birth.
 {¶ 3} When Mother had entered the detention facility, as with all other detainees, she had no security clearance to leave the facility or have visitors. By the time M.R. was born, however, Mother had been at the facility for several months and, by complying with the rules, had worked her way up to a security level that allowed her to leave the facility for visits. Beginning November 18, 2004, Mother was transported from the facility to have supervised visits with M.R. Mother was released from the detention facility on December 30, 2004 and was placed in a therapeutic foster home.
 {¶ 4} On January 27, 2005, Mother ran away from the foster home. Mother was "on the run" until May, and she ran away two more times during the pendency of her case planning period. Mother apparently ran away each time because she was dissatisfied with her own custodial situation. She expressed little concern about what was happening with her child.
 {¶ 5} On July 14, 2005, CSB moved for permanent custody of M.R. Following an evidentiary hearing, the trial court found that Mother had abandoned M.R., that she had failed to substantially remedy the conditions that led to M.R.'s removal, and that permanent custody was in the best interest of M.R. Mother appeals and raises two assignments of error, that will be addressed together because Mother argued them jointly.
 ASSIGNMENT OF ERROR I
"THE DECISION OF THE TRIAL COURT TO GRANT PERMANENT CUSTODY OF THE CHILDREN TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND IS NOT IN THE CHILD'S BEST INTEREST."
 ASSIGNMENT OF ERROR II
"CSB FAILED TO USE REASONABLE EFFORTS TO REUNITE THE FAMILY."
 {¶ 6} Mother contends that the trial court erred in granting CSB's motion for permanent custody. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re WilliamS. (1996), 75 Ohio St.3d 95, 99.
 {¶ 7} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v. Simon (2001), 141 Ohio App.3d 103, 115. "`The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" (Alterations sic). Id., quoting State v.Thompkins (1997), 78 Ohio St. 3d 380, 387, quoting State v.Martin (1983), 20 Ohio App. 3d 172, 175.
 {¶ 8} The trial court found that the first prong of the permanent custody test was met for two reasons: (1) the parents had abandoned M.R. and (2) Mother failed to substantially remedy the conditions that led to M.R.'s removal. The trial court also found that permanent custody was in the best interest of M.R. Consequently, it terminated parental rights and placed M.R. in the permanent custody of CSB. Mother challenges the trial court's findings on both prongs of the permanent custody test.
 {¶ 9} In addition to challenging both prongs of the permanent custody test, Mother contends that CSB failed to use reasonable case planning efforts to reunify this family. A lack of reasonable case planning effort will be reversible error, however, only if the trial court's order of permanent custody had been based on R.C. 2151.414(E)(1), which requires the trial court to find that the child cannot or should not be returned to either parent because the parent failed to substantially remedy the conditions causing the child to be placed outside the home "notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents[.]" See In the Matter of Ward
(Aug. 2, 2000), 4th Dist. No. 99CA2677, citing with approval Inre Scott (Sept. 17, 1999), 6th Dist. No. L-99-1012 ("`Absent any evidence of agency efforts [toward] reunification after the children's removal from the home, an R.C. 2151.414(E)(1) predicate finding cannot be sustained.'") "If an agency chooses to argue that the parent did not rectify the cause(s) for removal, then the parent must have an opportunity to do so."Ward, supra.
 {¶ 10} Although the trial court did base its permanent custody order, in part, on a finding that Mother had failed to substantially remedy the conditions that led to M.R.'s removal, it also found that the first prong of the permanent custody test had been satisfied for another reason: that Mother had abandoned M.R. Consequently, so long as the finding of abandonment was supported by the evidence, Mother cannot establish reversible error based on a lack of reasonable case planning efforts.
 {¶ 11} The trial court found that Mother had abandoned M.R. during the period from January 27, 2005 to May 13, 2005 when she ran from the foster home and failed to have any contact with M.R.R.C. 2151.011 (C) provides:
"For the purposes of this chapter, a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days."
 {¶ 12} The trial court found that Mother had abandoned M.R., and that finding is supported by the record. The evidence was undisputed that, on January 27, 2005, Mother ran away from her foster home. She was not apprehended until May 7, but ran away again six hours later and was apprehended again on May 13. Mother was gone for more than 90 days and, during that time, had no contact with M.R. In fact, she did not even ask about the child when she spoke to the caseworker two times. Although Mother asserts that her lack of contact was "not completely voluntary," there is no evidence that her decisions to run from the foster home and to have no contact were not voluntary. Therefore, the trial court's finding of abandonment satisfies the first prong of the permanent custody test, so its alternate finding under R.C.2151.414(E)(1) was not necessary.
 {¶ 13} Mother also challenges the trial court's finding that permanent custody was in the best interest of M.R. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999;
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
"(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C.2151.414(D)(1)-(5).
 {¶ 14} R.C. 2151.414(E)(10) is relevant here because it applies if the trial court finds that "[t]he parent has abandoned the child." Because the trial court's finding that Mother abandoned M.R. is intertwined with her interaction and interrelationship with M.R., those two best interest factors will be discussed together.
 {¶ 15} Mother had very little interaction with M.R. during the first year of the child's life. In fact, Mother had a total of nine one-hour visits with M.R. and, as a result, had no real bond with the child. Mother's first eight visits with M.R. took place during the first two months of M.R.'s life. On January 27, 2005, Mother ran away from the foster home. Mother lived "on the run" for the next three and a half months and had no contact with M.R. during that time, nor did she inquire about her.
 {¶ 16} Mother testified that while she was on the run, she did not get a job to support herself but instead lived with different friends and frequently drank alcohol or smoked marijuana. Mother called her caseworker two times during this period, but she did not ask about M.R. during either call. Instead, she asked about what would happen to her, apparently suspecting that she would be facing additional disciplinary consequences. During each call, the caseworker tried to persuade Mother to surrender herself to the authorities, but she did not.
 {¶ 17} Mother was apprehended by Akron Police on May 7, 2005 and, because the police were not aware that Mother was a flight risk, they placed her in an unsecured emergency shelter for teens. Within seven hours, Mother ran away again, but was again apprehended by the police six days later.
 {¶ 18} Mother was returned to the detention facility and again had to work her way up to a security level that allowed visits outside the facility. After Mother had worked her way back up to such a security level, Mother was transported from the facility for a visit with M.R. Probably because M.R. was much older and had not seen Mother for months, the visit did no go very smoothly. After the visit, Mother fled from CSB workers. She escaped out into traffic on a busy street and was able to get away. Mother was apprehended by police more than two weeks later and was returned to the detention facility, and again entered at a much lower security level because she had run away.
 {¶ 19} The CSB caseworker had assumed that Mother ran away after the visit because she was upset that the visit with her daughter did not go well. When Mother testified, however, she indicated that her motivation to run from the CSB workers that time was that she did not want to return to the detention facility, not that she was upset about her daughter.
 {¶ 20} Because M.R. was only one year old at the time of the permanent custody hearing, the guardian ad litem testified on her behalf. The guardian ad litem opined that permanent custody was in the best interest of M.R. She emphasized that Mother had been given time to work on the goals of her case plan but that she repeatedly ran away without considering the consequences of those actions. In a controlled environment such as the detention facility, she complied with some of the goals of the case plan, but in an uncontrolled environment, she continued to make bad choices and inevitably had to keep returning to the detention facility to start over again.
 {¶ 21} At the time of the permanent custody hearing, M.R. had spent her entire short life outside of her mother's custody. In the foster home, M.R. was developing a close bond with the foster family and the foster parents had indicated that they wished to adopt her. The caseworker stressed that these foster parents had gone above and beyond what she would expect of foster parents in caring for a child. M.R. was also developmentally on target, despite early concerns by CSB that M.R. might have developmental delays because Mother has an I.Q. of 56.
 {¶ 22} Mother, on the other hand, had made minimal progress during the first year of her daughter's life to improve her ability to parent her child. Mother had taken some parenting classes and anger management classes while in the detention facility, but she had demonstrated that she was not implementing what she should have learned. While she testified, Mother recited facts about child development and child care that she had learned in her parenting classes. Through other direct testimony and on cross-examination, however, Mother demonstrated a lack of basic knowledge about child care and development, such as what to feed children at certain ages, how often to feed or bathe a child, and basic developmental milestones for certain ages. The caseworker also testified that Mother's visits with M.R. had been strained because she did not seem to know how to handle or interact with a young child. While Mother's response was that she had not been given much of a chance to visit with M.R., Mother's lack of visitation with M.R. had been the result of her own behavior of running away and committing rule violations while in the detention center.
 {¶ 23} Mother completed anger management classes, but again was not implementing what she had learned. She continued to have verbal and physical altercations with her caseworker and with others in the detention center.
 {¶ 24} More significantly, Mother repeatedly ran away from authority, demonstrating not only that she did not accept responsibility for or consider the consequences her own actions, but also that she was placing her own wants and needs ahead of those of her child. When she called her caseworker two times, she asked about herself, not her child. While she was on the run, she admitted that she hung out with friends and drank alcohol and smoked marijuana, rather than trying to become self-sufficient.
 {¶ 25} Finally, the evidence demonstrated that M.R. was in need of a legally secure permanent placement and that Mother was not able to care for her, nor were there any relatives willing and able to care for her. Consequently, the trial court reasonably concluded that a legally secure placement could only be achieved through a grant of permanent custody to CSB.
 {¶ 26} Given the evidence on each of the best interest factors, the trial court did not lose its way in concluding that permanent custody was in the best interest of M.R. As explained above, the trial court had also been justified in finding that Mother abandoned M.R. Consequently, the trial court did not err in terminating mother's parental rights and placing M.R. in the permanent custody of CSB. The first and second assignments of error are overruled.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
Slaby, P.J. Moore, J. concur.
[1] According to Mother's testimony, her 18th birthday was May 5, 2006.