DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Jah'mal F. ("Father"), appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated his parental rights to his two minor children. This Court affirms.
 I. {¶ 2} Father is the natural father of several children, two of whom are at issue in this case, J.F. and A.F., twins born July 11, 2002. The children's mother ("Mother") voluntarily relinquished her parental rights and is not a party to this appeal. At the time CSB became involved with this family, J.F. and A.F. were *Page 2 
two years old and were living with their mother and her two older children. Mother's two older children are not Father's children and are not at issue in this appeal.
 {¶ 3} CSB's primary concerns about these children were the unsafe and unsanitary condition of their home and the lack of medical care that they had received. Both twins had been diagnosed with neurofibromatosis, a genetic condition that requires regular monitoring by medical professionals as it can develop life-threatening symptoms, but the children had not attended many of the appointments that had been scheduled with medical specialists. The children also had not received regular immunizations or well-care check-ups.
 {¶ 4} On November 18, 2004, the children were adjudicated neglected and dependent. Throughout most of the case planning period, the children remained in Mother's custody under an order of protective supervision by CSB. During May 2006, however, the children were removed from Mother's custody due to the "deplorable" conditions in the home. CSB would not place the children with Father because he had an extensive criminal record, and he had never allowed CSB personnel inside his home to do a home check. For the next three months, Father had no contact with the children.
 {¶ 5} On July 7, 2006, CSB moved for permanent custody of J.F. and A.F. Following a hearing on the motion, the trial court placed both children in the permanent custody of CSB. Father appeals and raises two assignments of error. *Page 3 
 II. ASSIGNMENT OF ERROR I "THE DECISION OF THE COURT TO GRANT PERMANENT CUSTODY OF THE CHILDREN TO [CSB] WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND NOT IN THE CHILDREN'S BEST INTERESTS]."
 {¶ 6} Father contends that the trial court's decision to terminate his parental rights and place the children in the permanent custody of CSB was against the manifest weight of the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a civil context, the standard of review is the same as that in the criminal context. Frederick v. Born (Aug. 21, 1996), 9th Dist. No. 95CA006286 at *6. In determining whether a criminal conviction is against the manifest weight of the evidence:
 "`The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 7} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for *Page 4 
at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S.
(1996), 75 Ohio St.3d 95, 99. Father challenges the trial court's findings on both prongs of the permanent custody test.
 {¶ 8} The trial court found that the first prong of the permanent custody test was satisfied for more than one reason, including that Father abandoned his children. See R.C. 2151.414(B)(1). R.C. 2151.011(C) provides that "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." There was undisputed evidence presented at the permanent custody hearing that Father saw his children on May 1, 2006 and that he may have seen them during the next few days, but he had no contact with them again until August 21, 2006. Therefore, the trial court found that the evidence was clear that Father had no contact with the children from May 4, 2006 until August 21, 2006, a period of more than 100 days. Because there had been a lack of contact for more than 90 days, the trial court found that a presumption of abandonment arose. *Page 5 
 {¶ 9} Father fails to point to any evidence to rebut the presumption of abandonment. See In re B.C.M., 9th Dist. No. 05CA0001,2005-Ohio-1818, at ¶ 8. He maintains in his appellate brief that his attempts to visit his children were "thwarted," but he points to no evidence in the record to support his argument. At the permanent custody hearing, there was no evidence of any justification for Father's failure to have contact with the children during that 90-day period. The trial court's finding that Father had abandoned his children for more than 90 days was fully supported by the evidence. Therefore, the trial court's finding on the first prong of the permanent custody test was not against the manifest weight of the evidence.
 {¶ 10} After the trial court found that the first prong of the permanent custody test was satisfied because Father had abandoned the children, it was required to determine whether permanent custody was in the best interests of the children. When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or *Page 6 
more months of a consecutive twenty-two month period ending on or after March 18, 1999;
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 "(5) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child." R.C. 2151.414(D)(1)-(5).
 {¶ 11} R.C. 2151.414(E)(10) applies to this case because the trial court found that Father had abandoned the children. Because the trial court's finding that Father abandoned the children is intertwined with his interaction and interrelationship with them, those two best interest factors will be discussed together. See In re M.R., 9th Dist. No. 23033,2006-Ohio-2558, at ¶ 14.
 {¶ 12} Throughout their lives, Father's interaction with the children had been sporadic. As indicated above, the trial court found that Father had abandoned J.F. and A.F. due to his complete lack of contact for more than 90 days. The evidence further revealed that Father had maintained little contact with the children throughout their four years of life. He babysat them for Mother now and then, but he never paid child support and never assumed an active role in their lives. While the children were in CSB custody, Father visited them only twice.
 {¶ 13} It is also significant that Father did not assume a parental role in the children's ongoing medical care. The children have neurofibromatosis, the same genetic disorder that their Father has. A medical expert explained at the hearing that their disorder can be potentially life threatening and must be regularly *Page 7 
monitored by medical professionals. The expert further explained that symptoms of the disorder can change over time and can vary widely from patient to patient. Consequently, caregivers must be trained to monitor the children's symptoms to know when medical intervention is necessary. Father tended to minimize the importance of the children receiving regular medical care and his need to be educated by professionals about how the disorder impacts his children. Father attended only one medical appointment with his children.
 {¶ 14} Because the children were only four years old at the time of the permanent custody hearing, the guardian ad litem spoke on their behalf. She opined that permanent custody was in their best interests. She emphasized that Father has never taken an active role in the lives of these children.
 {¶ 15} Father contends that the trial court should have assigned no weight to the recommendation of the guardian ad litem because she did not visit the foster home and did not consider other potential placements for the children. The report of the guardian ad litem includes a listing of almost 14 pages of the personal, telephone, and e-mail contacts that the guardian ad litem made over the entire two-year-period of this case. Included in this list are several of the friends and relatives that had been considered by CSB as potential placements for the children, suggesting that the guardian ad litem did consider other potential placements. Although the guardian's report does not indicate that she visited the foster home, Father fails to cite any authority that requires the guardian ad litem to visit the *Page 8 
foster home before rendering her opinion. In this case, the foster family had not expressed an interest in adopting the children.
 {¶ 16} Moreover, this Court emphasized in another permanent custody case that the trial court did not have the authority to reject a guardian ad litem's recommendation simply because the guardian did not visit the home of the foster parents:
 "R.C. 2151.414(D)(2) explicitly requires the trial court to consider the guardian ad litem's report as an expression of the wishes of a child who is too young to express them herself. The court does not have the option of disregarding it. The trial court noted that it essentially was disregarding the report of the guardian ad litem because he had not made a visit to the foster family's home to observe [T.] there. This Court knows of no statutory requirement, however, that the guardian ad litem visit the foster family. The guardian ad litem had explained that he saw no reason to observe the child with the foster family because they had indicated that they were not interested in adopting her. His justification for not visiting with the foster family does not seem unreasonable. The foster parents are not parties to the proceeding and their interests are often at odds with those of the parent." (Citations omitted.) In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at *5.
 {¶ 17} The custodial history of the children was spent primarily with Mother. Father lived with Mother until the children were approximately seven months old and then saw them only sporadically. During the two years that CSB was involved with this family, Father did almost nothing to work toward reunification with them. Father rarely visited the children and he failed to attend most of the scheduled hearings. He did not keep CSB informed of where he was living, nor did he provide the agency with a current phone number. Although *Page 9 
Father insisted that he had given the agency his address and phone number, his testimony was contradicted by other evidence. Both the caseworker and the guardian ad litem testified that they had made repeated attempts to reach Father by personally visiting the address and by calling the telephone number, but they were told again and again by those who answered that Father did not live at that address. Mother had also told them that she did not know how to reach Father.
 {¶ 18} After approximately one year of CSB involvement with this family, the guardian ad litem happened to run into Father at Mother's home, but Father's contact with the agency did not improve after that time. Father even admitted at the hearing that he "didn't cooperate with the CSB worker at any point" and that he did not contact the guardian ad litem. The only justification that Father offered for his lack of effort toward reunification was that he was depending on Mother to work toward reunification and apparently believed that it was unnecessary that he also do so. Despite Father's testimony that he loves his children and his suggestions that he would do anything for them, Father had demonstrated a lack of commitment to them.
 {¶ 19} J.F. and A.F., particularly due to their ongoing, incurable medical condition, are in need of a legally secure permanent placement. The evidence demonstrated that CSB had pursued numerous potential placements but there were no friends or relatives who could provide a suitable, long-term placement for the children. Therefore, the trial court reasonably concluded that a legally secure *Page 10 
permanent placement could only be achieved by granting permanent custody to CSB.
 {¶ 20} The evidence before the trial court on each of the best interest factors reasonably supported a conclusion that permanent custody was in the best interests of J.F. and A.F. The first assignment of error is overruled.
 ASSIGNMENT OF ERROR II "CSB FAILED TO USE REASONABLE EFFORTS TO REUNITE THE FAMILY."
 {¶ 21} Father also contends that CSB failed to use reasonable efforts to reunite the family. The premise of Father's argument is that, at the permanent custody hearing, CSB was required to prove, and the trial court was required to find, that CSB had made reasonable efforts toward reuniting the children with Father. This Court has held that, although CSB is required to prove that it put forth reasonable efforts toward reunification, R.C. 2151.419 requires it to do so at several stages of the proceedings, but not at the permanent custody hearing. See In reK.H., 9th Dist. No. 22765, 2005-Ohio-6323, at ¶ 9-10. The Ohio Supreme Court recently agreed with that interpretation of R.C. 2151.419. SeeIn re CF., 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 41-43.
 {¶ 22} The trial court made prior findings in this case that CSB had exerted reasonable efforts toward reunification. Because the record fails to include transcripts of the hearings at which the relevant evidence was presented, however, this Court must presume propriety of the reasonable efforts findings. Moreover, *Page 11 
this Court has no jurisdiction to reach the propriety of the reasonable efforts finding made when the children were adjudicated because, after the court entered its order of disposition, the adjudication and disposition became final and appealable and no timely appeal was filed. See In re Murray (1990), 52 Ohio St.3d 155, syllabus; R.C. 2501.02.
 {¶ 23} Because Father has failed to demonstrate any error in the trial court's reasonable efforts findings, the second assignment of error is overruled.
 III. {¶ 24} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). *Page 12 
The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
 SLABY, P. J., DICKINSON, J., CONCUR *Page 1