DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Margaret H. ("Mother"), has appealed from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her four minor children and placed the children in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I {¶ 2} Mother is the mother of four minor children, K.H., born October 15, 1996; G.H., born March 5, 1998; D.H., born March 19, 2000; and M.H., born July 29, 2001. Mother's husband ("Father") is the father of all four children, and, although he filed a joint notice of appeal with Mother, apparently he is not represented by counsel and he did not file a brief in this appeal.
 {¶ 3} CSB first became involved with this family on a voluntary basis during 2002 because Mother had left the family and took money, food stamps, and the family's only vehicle. CSB was concerned that Father, who was unemployed, would not be able to provide for his children's basic needs. The children were placed with their paternal grandfather. After a few months, and after Mother had returned to the home, the children were returned to their parents and the case was closed.
 {¶ 4} The children were removed from the home pursuant to Juv.R. 6 on October 1, 2003. CSB had received a referral that the family was about to be evicted and had no place to go. When the caseworker went to the home, no one answered the door but she could hear children crying and could see them through the windows. When the caseworker called the home, Mother answered the telephone but then hung up. The police eventually forced their way in. All of the children indicated that they were hungry and M.H., the youngest child, had a wound on his head that was crusted with blood and did not appear to have been treated.
 {¶ 5} On November 25, 2003, M.H. was adjudicated neglected and dependent and the other children were adjudicated dependent. During the first several months following their removal from the home, the children were again placed with the paternal grandfather. They were removed from that home after G.H. came to school covered with scratches, which apparently had been inflicted by her youngest brother, M.H.M.H. was very impulsive and aggressive and often scratched, hit, and kicked adults and other children. G.H. also alleged that she had been mistreated by her grandparents.
 {¶ 6} On January 5, 2005, CSB moved for permanent custody of all four children. The parents also moved for legal custody or, alternatively, a six-month extension of temporary custody. Following a hearing on the motions, the trial court found that the children had been in the temporary custody of CSB for more than 12 of the prior consecutive 22 months and that permanent custody was in their best interests. Therefore, the trial court terminated Mother's parental rights and placed all four children in the permanent custody of CSB.
 {¶ 7} Mother timely appealed and has asserted three assignments of error for review.
 II Assignment of Error Number One
"THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY WHEN [CSB] DID NOT USE REASONABLE CASE PLANNING AND DILIGENT EFFORTS AT REUNIFICATION WITH THE PARENTS."
 {¶ 8} Through her first assignment of error, Mother has asserted that the trial court erred in terminating her parental rights because CSB did not use reasonable and diligent efforts to reunite her with her children. The premise of Mother's argument is that, at the hearing on its motion for permanent custody, CSB was required to prove that it had used reasonable and diligent efforts to reunify Mother with her children. We disagree.
 {¶ 9} CSB was required to prove that it put forth efforts toward reunification, but it was required to make that showing much earlier in the case planning process, not nineteen months after the children were removed from the home. R.C. 2151.419(A) explicitly requires the agency to establish that it has made reasonable efforts toward reunification or to prevent continued removal of the child from the home "at any hearing held pursuant to section 2151.28 [shelter care], division (E) of section 2151.31
[ex parte emergency temporary custody], or section 2151.314 [shelter care placement], 2151.33 [pre-adjudication temporary placement], or 2151.353 [initial disposition following adjudication] of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home[.]" Each of these hearings would necessarily occur several months before the permanent custody hearing, unless the agency had requested permanent custody in its initial complaint, which it did not do in this case.
 {¶ 10} CSB filed its motion for permanent custody after the children had been in its temporary custody for twelve months, under R.C. 2151.413, and the juvenile court held a hearing on that motion pursuant to R.C.2151.414. R.C. 2151.419, by its explicit terms, does not apply to hearings held pursuant to R.C. 2151.414. Consequently, R.C. 2151.419 did not require the trial court to make a finding of reasonable efforts at the permanent custody hearing. See In re S.S., 10th Dist. No. 05AP-204,2005-Ohio-4282.
 {¶ 11} In child dependency and neglect cases, the trial court is required to follow the procedures that are set forth in a comprehensive statutory scheme. In re D.R., 153 Ohio App.3d 156, 2003-Ohio-2852, at ¶ 13. "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." In re C.W., 104 Ohio St.3d 163, 2004-Ohio-6411, at ¶ 9. This Court has repeatedly held that R.C. 2151.414 places no duty on the agency to prove that it exerted reasonable and diligent efforts toward reunification. See, e.g., In re Thompson (Jan. 10, 2001), 9th Dist. No. 20201; In re Moore (Dec. 15, 1999), 9th Dist. Nos. 19202 and 19217. Mother has not argued that this Court should depart from its prior holdings on this issue, nor does she cite any legal authority to convince us that we should.
 {¶ 12} Because Mother has failed to demonstrate that the trial court was required to find reasonable efforts on the part of CSB at this late stage of the proceedings, the first assignment of error is overruled.
 Assignment of Error Number Two
"THE TRIAL COURT'S DETERMINATION THAT PERMANENT CUSTODY WAS IN THE BEST INTEREST OF THE CHILDREN WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND MUST BE REVERSED."
 {¶ 13} Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99. The trial court found that the first prong of the test was satisfied because all four children had been in the temporary custody of CSB for at least 12 of the prior 22 months and Mother does not contest that finding. Mother challenges only the best interest prong of the permanent custody test, contending that the trial court's best interest finding was against the manifest weight of the evidence.
 {¶ 14} When reviewing the weight of the evidence, this Court applies the same test in civil cases as it does in criminal cases. Tewarson v.Simon (2001), 141 Ohio App.3d 103, 115. "The [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." (Alterations sic). Id., citing State v.Thompkins (1997), 78 Ohio St. 3d 380, 387, quoting State v. Martin
(1983), 20 Ohio App. 3d 172, 175.
 {¶ 15} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
"(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
"(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
"(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
"(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4).[1]
 {¶ 16} "Although the trial court is not precluded from considering other relevant factors, the statute explicitly requires the court to consider all of the enumerated factors." See In re Smith (Jan. 2, 2002), 9th Dist. No. 20711, at 6; see, also, In re Palladino, 11th Dist. No. 2002-G-2445, 2002-Ohio-5606, at ¶ 24.
 {¶ 17} The best interest prong of the permanent custody test requires the agency to prove by clear and convincing evidence that permanent custody is in the best interest of the child. Clear and convincing evidence is that which will produce in the trier of fact "`a firm belief or conviction as to the facts sought to be established.'" In re Adoptionof Holcomb (1985), 18 Ohio St.3d 361, 368, quoting Cross v. Ledford
(1954), 161 Ohio St. 469, paragraph three of the syllabus.
 {¶ 18} Prior to the hearing, the children had lived outside Mother's home for nineteen months. During that time, their interaction with Mother had been limited to weekly, supervised visits at the CSB visitation center. Although Mother attended visits fairly regularly and the children were always happy to see her, CSB had never allowed more frequent or unsupervised visits because the visits were so "chaotic." The social service aide who supervised many of the visits explained that the children would run around and Mother had difficulty keeping them in the visitation area. Mother did not set limits for the children, nor did she discipline them in any way. She also tended to focus on only one child at a time and could not control all four at once. Visits were so unstructured that CSB held a visitation planning meeting with Mother to try to help her gain some control over her children. CSB taught Mother several ways to improve the visits but Mother never utilized any of those tactics, despite her signed agreement that she would do so.
 {¶ 19} The social service aide further explained that, during their visits with Mother, the children would play primarily by themselves and their interaction with Mother was "minimal." She also indicated that the children did not have difficulty separating from Mother at the end of each visit and they were always happy to reunite with their foster parents.
 {¶ 20} Each of the children had behavior problems and each had been in individual counseling for that reason for approximately one year. As the guardian ad litem explained, the children were "wild and out of control when they entered foster care." They lacked social skills and had extreme difficulty following directions and abiding by rules. The youngest child, M.H., was impulsive and aggressive and would often scratch, hit, and kick other children and adults. M.H. had also inflicted injury on himself by banging his head against the wall or window.
 {¶ 21} Mother has argued that there was no evidence to link the children's behavior problems to her parenting but has maintained that the children developed all of their problems after CSB removed them from her home. Mother testified about being a good parent while her children lived with her, explaining that the children never fought when they lived with her; that she fed her children three meals each day; that either she or her husband was always awake watching the children, despite the fact that they worked different shifts; and that she walked K.H. to school every day, although she could not remember the name of his school. Mother's testimony that she had been a good parent was contradicted by other evidence, however.
 {¶ 22} An observation made by several witnesses was that the two older children, K.H. and G.H., at very young ages, had apparently assumed the roles of caretakers to their younger siblings. As G.H. had explained to her counselor, her parents did not care for her younger siblings because her parents were always sleeping. Consequently, the children were left to fend for themselves and G.H. would help feed and dress her younger brothers. K.H. likewise had assumed the role of caretaker to his younger siblings and, even in the foster home where he and D.H. lived together, he was having difficulty assuming the role of D.H.'s older sibling rather than his caretaker.
 {¶ 23} G.H.'s counselor further testified that G.H. did not have an understanding of family aside from a group of people living together. She explained that G.H. seemed to be unaware that families do things together and take care of each other. The counselor further elaborated that G.H. has concentrated on meeting her basic survival needs and would do whatever she needed to do to survive, including hitting her brothers or stealing food from them. When G.H. first came into foster care, she would hoard food but she stopped doing that once she learned that her foster parents would feed her regularly. The counselor opined that G.H.'s survival attitude was the result of her upbringing.
 {¶ 24} K.H. was held back in kindergarten because he missed so many days of school and because he did not have the skills to move on to the first grade. Although K.H. completed his first year of kindergarten after he was removed from Mother's home, there was evidence that K.H. had an attendance problem while he was living with Mother.
 {¶ 25} Although the social service aide testified that there seemed to be a bond between Mother and her children, almost every one of the counselors gave contrary testimony. Each of the children's counselors testified that the children did not talk about Mother unless they were asked and, even then, they did not have much to say about her. G.H.'s counselor explained that G.H. has expressed indifference about being removed from Mother's home. G.H.'s counselor stated that she did not believe that G.H. had a strong attachment to Mother. The counselor gave a few examples of behavior that had led her to that conclusion, such as G.H. failing to include her parents in a family portrait that she drew and that G.H. never mentioned her parents without being asked. The counselor explained that, in her experience counseling children, G.H.'s failure to mention her mother meant that she did not feel connected to her. The counselor for M.H. also testified that he believed that M.H.'s weak attachments with adults dated back to before his removal from Mother's home.
 {¶ 26} G.H.'s counselor explained that G.H. had difficulty bonding to people or developing relationships, but that she seemed to be somewhat bonded to the foster family and felt connected with them. G.H. described her foster home, where she lived with M.H., as the safest place that she had ever lived. K.H. and D.H., who lived together in a different foster home, had adjusted to that home and were doing very well there.
 {¶ 27} The guardian ad litem testified on behalf of the children and submitted a twenty-eight-page report. She also indicated that K.H. had told her the he would like to stay with his foster family, but he would like to return to Mother if he could not stay in the foster home. None of the younger children expressed their desires to the guardian ad litem.[2]
Each child's therapist had explained through their testimony how little the children spoke about Mother, even when asked, and that K.H. was even reluctant to speak about her when asked.
 {¶ 28} The trial court commended the guardian ad litem for the great deal of time that she spent with this family. The guardian ad litem had worked with this family since shortly after the children were removed from the home and had worked with them during the prior period that they lived outside their home. She had made hundreds of contacts with individuals involved in the children's lives and had visited with the family more than forty times. She observed seven visits between the children and Mother.
 {¶ 29} The guardian ad litem was particularly concerned about Mother's lack of supervision of the children. She noted that that the problem was long-standing and extensive, emphasizing that the older two children had been caring for the others at their very young ages and that none of the children even knew basic hygiene when they came into foster care. The guardian ad litem stressed that Mother lacked the parenting skills, stability, and financial ability to care for her four children. She also emphasized that Mother had made minimal effort toward achieving any of the reunification goals of her case plan, despite having more than a year and a half to do so. The guardian ad litem opined that permanent custody was in the best interests of the children.
 {¶ 30} The children had been in the temporary custody of CSB for more than 12 of the 22 consecutive months prior to the hearing. Although this Court has held that "the time period in and of itself cannot be held against the parent without considering the reasons for it and the implications that it had on [these children][,]" there was little progress toward reunification of this family during this period. See In reSmith, supra, at 10. Unlike the mother in In re Smith who had spent the case planning period working to accomplish the reunification goals of her case plan, Mother made little progress toward improving her ability to provide a stable home for her children. Mother had not even started on most of the requirements of her case plan. She had a mental health assessment, but never followed up with the recommendation that she attend individual counseling and marriage counseling. At the permanent custody hearing, she indicated that she was ready to attend individual counseling, yet she had not begun counseling during the past year and a half.
 {¶ 31} Mother's lack of stable housing and employment had continued throughout the case plan period. She had lived in several different places and had been terminated from several different jobs and still had not taken classes toward earning her GED. Mother apparently believed that she could pass the GED test without taking any classes, yet she had never gone to take the test.
 {¶ 32} The primary concern of CSB was Mother's lack of supervision of her children and Mother had shown no improvement in this area during her visits with the children. CSB met with Mother to provide suggestions for improving the visits but she did not follow them. Mother made several appointments to start parenting classes during 2004 but did not actually attend an appointment until March of 2005. At the time of the hearing, she had completed approximately one-third of the required parenting classes but Mother had told the director of the parenting center that she already knew everything that they were teaching her and that she had already been using all of those techniques as a parent. The parenting center director expressed concern that Mother did not accept any responsibility for the fact that her children had been removed from her home or that the removal had continued for over a year.
 {¶ 33} The children, on the other hand, were showing improvements during this period. Through continued counseling involving boundary setting, and reinforcement of those concepts in their respective foster homes, the children's behavior problems had diminished and they were learning to follow rules and directions. M.H., the youngest child, was still having a lot of difficulty controlling his impulses, but the older children had shown considerable improvement.
 {¶ 34} There was evidence that these four children were in need of a legally secure permanent placement. Several of the children's counselors testified that, due to their behavior problems and the apparent lack of structure in their former home, each of these children was in need of a very structured environment, with clear rules and boundaries and consequences for failing to abide by the rules.
 {¶ 35} The evidence also demonstrated that the trial court had no other options for a permanent placement. PPLA was not an option in this case and there were no suitable relatives able to take legal custody of the children. Consequently, the trial court reasonably concluded that a legally secure permanent placement could only be achieved by placing the children in the permanent custody of CSB.
 {¶ 36} Given the evidence before the trial court, this Court cannot say that it lost its way in concluding that permanent custody was in the best interests of K.H., G.H., D.H., and M.H. The second assignment of error is overruled.
 Assignment of Error Number Three
"THE TRIAL COURT COMMITTED PLAIN ERROR BY FAILING TO INQUIRE INTO WHETHER [THE] GAL REPRESENTED THE WISHES OF THE CHILDREN AND APPOINT THEM LEGAL COUNSEL."
 {¶ 37} Through her final assignment of error, Mother has argued that the trial court committed plain error by failing to inquire into whether a conflict existed between the views of the guardian ad litem and the wishes of the children and, if a conflict did exist, appoint the children legal counsel. We disagree.
 {¶ 38} Where there is an affirmative demonstration of a conflict between the views of the attorney guardian ad litem and the wishes of the children, the trial court is obligated to appoint independent legal counsel to represent the children. See Juv.R. 4(B) and R.C. 2151.281(A)(2). There was no evidence in this case that the children's wishes were in conflict with the opinion of the guardian ad litem that permanent custody was in the best interests of the children. Although K.H. had told the guardian ad litem that he wanted to be returned to his mother if he could not stay with the foster family, his primary desire was to stay in the foster home.
 {¶ 39} Moreover, the guardian ad litem in this case was not an attorney and, therefore, could not serve in the dual capacity of guardian ad litem and attorney for the children. No attorney had been appointed to represent the children in this case.
 {¶ 40} "Pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." In reWilliams, 101 Ohio St.3d 398, 2004-Ohio-1500, at syllabus. Consequently, the children were entitled to counsel in this proceeding.
 {¶ 41} None of the parties ever requested the trial court to appoint counsel for the children, however. Other appellate districts have held that this issue must be raised in the trial court to preserve it for appellate review.
"Juv.R. 4(A) states that every party `shall have the right to be represented by counsel * * *.' It does not state that the trial court must appoint an attorney for every party. If an indigent party requests an attorney, the trial court is of course required to appoint one. There is no evidence in the record of this case that a request was made for counsel to represent the children. Pursuant to Juv.R. 4(A), the only time the trial court is required to appoint an attorney to represent a child is when the complaint alleges abuse. There was no allegation of abuse in this case and, therefore, the trial court was not required by Juv.R. 4(A) to appoint an attorney to represent the children." (Alterations sic.) Inre Brittany T. (Dec. 21, 2001) 6th Dist. No. L-01-1369. See, also, In reGraham, 4th Dist. No. 01CA57, 2002-Ohio-4411, at ¶ 31-33.
This Court has likewise held that, where no request was made in the trial court for counsel to be appointed for the children, the issue will not be addressed for the first time on appeal. In re B.B. and B.B., 9th Dist. No. 21447, 2003-Ohio-3314, at ¶ 7.
 {¶ 42} Although Mother has asserted that the trial court committed plain error by failing to appoint counsel for the children, the plain error doctrine is rarely utilized in civil cases:
"In appeals of civil cases, the plain error doctrine is not favored and may be applied only in the extremely rare case involving exceptional circumstances where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." Goldfuss v. Davidson (1997),79 Ohio St.3d 116, syllabus.
 {¶ 43} Mother has failed to convince this Court that this is one of the extremely rare civil cases that warrant the application of the plain error doctrine in a civil case. The third assignment of error is overruled.
 III {¶ 44} The assignments of error are overruled. The judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Exceptions.
Slaby, P.J., concurs.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.
[2] None of the parties filed a request for an in camera interview of any of the children in this case.