DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Appellant, Amy Madden, appeals from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her two minor children and placed them in the permanent custody of Summit County Children Services Board ("CSB"). This Court affirms.
 I. *Page 2 {¶ 2} Madden is the natural mother of K.W., born January 16, 2001, and N.G., born June 11, 2002.[1] The fathers of the children are not parties to this appeal.
 {¶ 3} CSB first became involved with this family through a prior case. The children were removed from Madden's home during December 2003, and the case was not closed for approximately nine months, but there are few additional details about the prior case in the record. Because CSB offered little evidence about the prior case (either through the prior case file, documents from it, or detailed testimony about it), this Court has almost no details about that historical aspect of this dependency case. As the trial judge explicitly noted at the hearing, such evidence is clearly relevant to the permanent custody decision pursuant to R.C. 2151.414(D)(3), yet the agency did not develop these facts as part of its permanent custody case. During the hearing, CSB made occasional references to the prior case but never presented any specific details into evidence. Although the trial judge may have had personal knowledge of the facts of the prior case, this Court's review is limited to the record on appeal, which includes only scant details about the prior case.
 {¶ 4} The current dependency case began in November 2004. The children were removed from Madden's home pursuant to Juv.R. 6 after police *Page 3 
discovered a methamphetamine lab in the attic of the home. Madden, who was already facing prior drug manufacturing charges, was arrested and later convicted of offenses related to the production of drugs. The children were adjudicated dependent on February 7, 2005.
 {¶ 5} Although CSB initially had concerns that Madden was a substance abuser, Madden dispelled the agency's substance abuse concerns after regular drug screening failed to reveal the presence of any drugs or alcohol and Madden met with her caseworker repeatedly and never appeared to be under the influence of any substance. Madden did concede that she had a problem managing her anger, however, and that her children had come from a home in which they had been exposed to drug abuse and domestic violence. Madden also suspected that they had been exposed to sexual abuse while in her care.
 {¶ 6} Each child had serious behavioral problems and experienced frequent nightmares. N.G. also had significant developmental delays. Because there had been a long-standing problem with violence in the home, the agency focused on the needs of all family members to receive ongoing individual and family counseling. CSB also targeted its case planning efforts on N.G.'s need for therapy to address his developmental delays. *Page 4 
 {¶ 7} While in foster care, the children attended counseling and N.G. received extensive therapy and, as a result, each child had made significant improvements. Throughout this period, however, Madden tended to minimize the extent of her children's problems and indicated that she did not feel that they needed counseling or therapy. Madden believed that all of her children's problems were caused by being removed from her care.
 {¶ 8} Madden admitted that she had anger management issues. One of CSB's primary goals for Madden was for her to improve her ability to manage her anger and impulsive behavior. Madden did not consistently attend individual or family counseling, however, and she continued to respond to situations by acting impulsively out of anger.
 {¶ 9} On September 14, 2006, CSB moved for permanent custody of K.W. and N.G. Madden later moved for legal custody of both children. Following a hearing on the motions, the trial court terminated Madden's parental rights and placed K.W. and N.G. in the permanent custody of CSB. Madden appeals and raises two assignments of error. *Page 5 
 II. FIRST ASSIGNMENT OF ERROR "THE TRIAL COURT'S DECISION TERMINATING APPELLANT-MOTHER'S PARENTAL RIGHTS WAS NOT SUPPORTED BY CLEAR AND CONVINCING EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE[.]"
 {¶ 10} Madden contends that the trial court's permanent custody decision was not supported by the evidence. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C.2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996),75 Ohio St.3d 95, 98-99. The trial court found that the first prong of the test was satisfied because K.W. and N.G. had been in the temporary custody of CSB for well over 12 of the prior 22 months and Madden does not contest that finding. She challenges only the trial court's findings on the best interest prong of the permanent custody test. *Page 6 
 {¶ 11} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and]
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4)[2].
 {¶ 12} The interaction and interrelationship between Madden and the children was limited to supervised visitations. The evidence demonstrated that the children usually looked forward to their visits with Madden and that her behavior was generally appropriate, but she would sometimes become irritated and yell during the visits. During family counseling, the therapist observed that Madden became easily frustrated with the children. *Page 7 
 {¶ 13} Madden's attendance at visits was not consistent, however, because she often left the visitation center, or failed to come to the visits, because she was angry about something. Several witnesses testified that when Madden became upset about a situation, she tended to act in response to her anger, rather than doing what was in the best interest of the children. Despite repeated discussions about this problem with the caseworkers and therapists, several witnesses recounted numerous examples of situations in which Madden had acted on her anger, and in so doing, acted against the interests of her children. Madden missed repeated visits with her children because she was angry about the fact that one of the children would not be present or would be late for the visit. Thus, rather than having a shorter visit or a visit with only one of her children, Madden left the center because she was angry and had no visit at all. One or both children were often left waiting and wondering why their mother did not attend the visit. N.G. often made the one-hour drive from the foster home only to find that his mother was not there. During the three months before the hearing, Madden failed to show for 10 of the scheduled visits with her children. One missed visit was at Christmastime and the children were very disappointed that Madden did not show because they had brought gifts for her.
 {¶ 14} Each child had expressed to the guardian ad litem and others that they did not want to return to Madden's home but would like to remain with their foster parents. One of N.G.'s therapists testified that N.G. expressed ambivalence *Page 8 
and anxiety toward his mother. In fact, the therapist had been unable to get N.G. to say anything positive about his mother. All of N.G.'s references to his mother were negative and he expressed fear about returning to her home because she might hurt him. N.G. had also told several witnesses that he was afraid of his mother and that she would hit him and scream at him. The children had told others that Madden would lock them in their room or in a closet and each recounted incidents of physical and sexual abuse while living with Madden. Madden did not dispute that her children had been exposed to domestic violence in her home.
 {¶ 15} The guardian ad litem also opined that permanent custody was in the best interests of the children. She expressed concern that Madden lived in a "circle of chaos," explaining that Madden often escalated problems by overreacting to them. The guardian ad litem and other witnesses described Madden's problem-solving procedure as a "fight or flight" response and emphasized that Madden seemed to lack the ability to pause, assess a situation, and respond appropriately. The guardian ad litem testified that, although Madden had complied with many of the requirements of her case plan, she did not demonstrate that she could implement any of what she had learned. Along these same lines, another witness had expressed concern about whether Madden could care for her children because she could barely care for herself. She explained that Madden lived day to day and had trouble planning ahead. *Page 9 
 {¶ 16} The children's custodial history had been spent primarily in the custody of CSB. By the time of the permanent custody hearing, the children had spent well over two years outside of Madden's custody.[3]
Although the two children had spent only a short portion of their lives living with their mother, the children's memories of living with their mother have haunted them and both children spent over two years working to remedy the damage that had been done while living in Madden's home.
 {¶ 17} When the children came into CSB custody, both were dealing with the effects of living with neglect, abuse, and exposure to violence and drugs. Each child was exhibiting behavior problems and having nightmares. N.G. was extremely aggressive, had great difficulty controlling his impulses, and would inflict harm on himself, others, and animals. Because N.G. had extreme problems with controlling his impulses, he was attending counseling with two different therapists. N.G. was also attending speech and occupational therapy for his developmental delays. He was making progress but would need ongoing therapy and a stable and supportive environment. Madden did not appreciate the need for her children to attend therapy and she had indicated that she thought it was a waste *Page 10 
of time. She believed that all of the children's problems would be solved if they were returned to her custody.
 {¶ 18} There was also evidence that both children were in need of a legally secure permanent placement. N.G. in particular was in need of continued counseling, as well as regular speech and occupational therapy to address his developmental delays and academic problems. It would be necessary for the caregiver of these children to be supportive of all of the services that they need. The agency presented evidence that there are no suitable relatives willing and able to take long-term custody of the children. Consequently, the trial court reasonably concluded that a legally secure permanent placement could be achieved only through a grant of permanent custody to CSB.
 {¶ 19} Given the evidence before the trial court, it did not err in finding that permanent custody was in the best interests of K.W. and N.G. The first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR "THE TRIAL COURT ERRED BY NOT GRANTING APPELLANT-MOTHER'S MOTION FOR LEGAL CUSTODY WHERE CSB FAILED TO USE REASONABLE EFFORTS TO REUNITE APPELLANT-MOTHER AND HER MINOR CHILDREN[.]"
 {¶ 20} Madden's sole argument under this assignment of error is that the trial court erred in failing to return the children to Madden because CSB failed to demonstrate that it used reasonable efforts to reunify the family. This Court has *Page 11 
held that, although CSB is required to prove that it put forth reasonable efforts toward reunification, R.C. 2151.419 requires it to do so at several stages of the proceedings, but not at the permanent custody hearing. See In re K.H., 9th Dist. No. 22765, 2005-Ohio-6323, at ¶ 9-10. The Ohio Supreme Court recently agreed with that interpretation of R.C. 2151.419. See In re CF., 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶ 41-43.
 {¶ 21} The trial court made several prior findings in this case that CSB had exerted reasonable efforts toward reunification. Because the record fails to include transcripts of the hearings at which the relevant evidence was presented, however, this Court must presume propriety of the reasonable efforts findings. Therefore, the second assignment of error is overruled.
 III. {¶ 22} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into *Page 12 
execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
SLABY, P. J., BAIRD, J. CONCUR.
(Baird, J., retired, of the Ninth District Court of Appeals, sitting by assignment pursuant to, § 6(C), Article IV, Constitution.)
[1] Madden gave birth to a third child during the pendency of this case. That child, who was later removed from her home, is not at issue in this case.
[2] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case.
[3] Although CSB asserted during closing argument that the children's total time in CSB custody was even longer, the agency's calculation included time from the prior case and those facts are not in the record. *Page 1