[Cite as *In re P.W.T.*, 2011-Ohio-5858.]

| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| --- | --- | --- | --- |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF WAYNE | ) | | |

IN RE: P.W.T.

C.A. No. 11CA0020

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF WAYNE, OHIO
CASE No. 08-0710-AND

DECISION AND JOURNAL ENTRY

Dated: November 14, 2011

CARR, Presiding Judge.

{¶1}   Appellant, Teresa T. ("Mother"), appeals from a judgment of the Wayne County Court of Common Pleas, Juvenile Division, that terminated her parental rights to her minor child and placed him in the permanent custody of Wayne County Children Services Board ("CSB"). This Court affirms.

I.

{¶2}   Mother is the natural mother of PWT, born June 6, 2007. PWT's father was not actively involved in this case and is not a party to the appeal.   Although Mother has four other children, a daughter and three older sons, none of those children was in her custody when this case began.   Her daughter was an adult and her three older sons lived in the custody of their fathers.   It is not clear from the record why none of Mother's other sons was living with her, but at least one of them was removed from her custody by Allen County Children Services due to her untreated mental health problems.

**{¶3}** During July 2008, because Mother was then living in Wayne County, CSB received a referral from Allen County Children Services that Mother might pose a threat to PWT because she was not attending counseling or taking her prescribed psychiatric medication. According to the referral, Mother had been diagnosed with serious mental health issues and required regular mental health treatment.

**{¶4}** When a CSB intake caseworker went to Mother's home to investigate, Mother insisted on speaking to the caseworker through the door because she did not have a court order. Mother did not allow the caseworker in the house to see PWT. During their conversation, the caseworker became concerned that Mother was not speaking rationally. For example, Mother told the caseworker that she had filed several lawsuits against Allen County Children Services because it had ignored her reports that her landlord, "an undercover drug dealing F.B.I. agent," was breaking into her home at night and abusing her and her child. Due to CSB's concerns about Mother's mental health, PWT was removed from her custody. He was later adjudicated a dependent child.

**{¶5}** Mother's mental instability was the primary obstacle to her reunification with PWT, as she appeared to be otherwise able to care for him. After a psychological evaluation, Mother was diagnosed with schizoaffective disorder and personality disorder, not otherwise specified. Her symptoms included paranoid and delusional thoughts that she could not control. The psychologist who performed the evaluation opined that, without treatment, Mother's distorted perceptions of the world would have a negative impact on PWT, particularly as he grew older and tried to make sense of her "purported fears and her paranoia of others." She further explained that, due to Mother's paranoia, she intended to isolate PWT from others, which would only magnify the negative impact of her behavior on his emotional development.

{¶6}    Because Mother's untreated mental illness would affect her ability to interact with PWT, the psychologist advised CSB that Mother's visits with him should be supervised until she engaged in ongoing treatment and demonstrated significant progress.  Mother refused to get regular mental health treatment, however, because she insisted that she did not need it.  Consequently, her visits with PWT remained supervised at the visitation center throughout this case.

{¶7}    Due to the paranoia and delusions that stemmed from her untreated mental illness, Mother had repeatedly made unfounded allegations of sexual abuse and other mistreatment against others, including another psychologist, children services workers in both Allen and Wayne Counties, and the fathers of most of her children.  None of her allegations had resulted in criminal prosecutions or civil judgments in her favor, nor had she prevented the fathers of her other children from maintaining custody of them.  Nonetheless, Mother continued to express her beliefs that numerous other people had raped or otherwise harmed her and her children and that they continued to pose a threat to them.  The psychologist who supervised Mother's assessment insisted on the presence of a neutral witness due to her concerns that Mother might again make unfounded allegations of sexual assault.  This was the only time in her twenty-five years' experience that she had felt such a compelling need to protect another mental health professional against unfounded allegations of abuse.

{¶8}    After Mother made specific allegations about one of its case aides, CSB decided to video record all future visits between Mother and PWT.  Although the recordings were apparently made to protect the agency and its workers against further allegations of abuse, they also documented that Mother consistently attended visits; brought food, gifts, and engaged in activities with PWT; and also that she rarely interacted with him at an age-appropriate level.

Mother almost always talked above his developmental level by using complex words and discussing topics that a toddler or preschooler would not understand.

{¶9} More significantly, Mother would frequently talk to him about danger to herself or him, with a disturbing, paranoid, and even delusional focus on injury, death, and "bad people." When PWT was less than two or three years old, he seemed to ignore those comments and continued to play or engage in other activities. As he grew older and became more verbal, however, Mother discussed disturbing topics more frequently, and PWT began responding to what she was saying, showing that he was trying to understand the bizarre substance of her words.

{¶10} Because Mother refused to recognize and/or address her mental health problems, CSB eventually moved for permanent custody of PWT. Following a hearing on the motion, at which the evidence included the testimony of several witnesses and the recordings of several visits between Mother and PWT, the trial court terminated Mother's parental rights and placed PWT in the permanent custody of CSB. Mother appeals and raises two assignments of error.

II.

**ASSIGNMENT OF ERROR I**

"THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF [PWT] TO [C.S.B.] BECAUSE THE CASE PLAN IMPLEMENTED BY THE AGENCY WAS NOT REASONABLY CALCULATED TO SUCCEED IN REUNIFYING [P.W.T] WITH HIS MOTHER."

{¶11} Mother's first assignment of error is that CSB did not exert reasonable efforts to reunify her with PWT. Specifically, she maintains that CSB treated her differently from other parents due to her mental illness and did not seriously work with her toward reunification with PWT. To begin with, Mother did not raise this issue during the two and one-half years that this

case was pending in the trial court. At the time of the permanent custody hearing, after PWT had been in agency custody for two years, the trial court was not required to again find that CSB had made reasonable efforts toward reunification. See *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, at ¶41-43; *In re K.H.*, 9th Dist. No. 22765, 2005-Ohio-6323, at ¶9-10.

**{¶12}** Moreover, the record reveals that, although Mother had been able to meet PWT's basic needs during the first year of his life, CSB's concern about how he would be affected by her untreated mental illness was well founded. Mother had been diagnosed with schizoaffective disorder and personality disorder, not otherwise specified. The psychologist who supervised her assessment testified that Mother would need ongoing treatment of her schizoaffective disorder, which would require "very intensive medical management of [her] symptoms[.]" She explained that people with this disorder have an unusual way of viewing the world, unreasonably feel put upon by others, and often seek revenge. The illness has aspects of schizophrenia, including delusions, hallucinations, and persecutory notions. It also has bipolar-like symptoms that include dramatic mood changes, a lack of impulse control, and a tendency toward paranoia. Both disorders also cause Mother to have a tendency toward grandiose and narcissistic feelings about herself and her child. For example, Mother believed that PWT was able to speak when he was a few days old, that he could read and had an adult level of understanding at the age of two or three, and that he had reached other developmental milestones long before he actually had. Because of Mother's unrealistic views about PWT's development, the experts cautioned that she might expect him to be able to protect himself and otherwise meet his own needs when he could not.

**{¶13}** It was Mother, not CSB, who refused to work to address the mental health problems that prevented her from being reunited with PWT. Mother admitted that she

participated in a psychological evaluation only because CSB required it. She later told the court that she did not trust the credentials of the psychologist who evaluated her and did not accept her assessment of her. Although the caseworker repeatedly referred Mother to service providers and explained to her that reunification with PWT depended on her obtaining ongoing mental health treatment and achieving and maintaining a stable emotional state, Mother insisted that she did not need counseling or medication. Mother never participated in ongoing counseling and did not obtain a psychiatric evaluation.

{¶14} Mother further faults CSB for failing to offer her parenting advice, redirect her inappropriate behavior, or otherwise provide her parenting assistance during her visits with PWT. Mother made it clear to CSB early in this case, however, that she would not cooperate or work with anyone about being reunified with PWT. Mother admitted to the trial court that she did not listen to children services workers because she perceived them "as being uneducated and incompetent in their area of alleged expertise." She claimed that CSB personnel had verbally and emotionally abused her and that their abuse of PWT had been "verbal, emotional, medical, and physical." Mother also had extensive criticism of Allen County Children Services and testified that she had also refused to allow them to give her parenting direction.

{¶15} The caseworker explained that, although CSB workers did step in to correct Mother's inappropriate behavior during the early visits in this case, Mother would not follow their suggestions but would become explosive in front of PWT, which merely exacerbated the situation. After it became clear that Mother refused to take direction from CSB, an administrative decision was made that those supervising the visits would observe, take notes, and intervene only when they believed PWT was in danger.

{¶16} Even if Mother refused the agency's attempts to assist her, however, the primary purpose of CSB supervising the visits was to protect the child. It is very troubling to this Court that, despite the concerns expressed by the psychological experts that PWT would eventually be affected by Mother's bizarre behavior, CSB allowed him to be exposed to hour after hour of her disturbing comments. By the end of the video evidence, it was clear that PWT was suffering emotional harm from Mother's behavior, yet CSB did not intervene to redirect or end these highly disturbing conversations, but simply sat back and recorded the evidence. Any risk that Mother would have become explosive in front of PWT was outweighed by the benefit of changing the topic of conversation.

{¶17} Because Mother has failed to demonstrate that CSB failed to exert reasonable efforts to reunify her with PWT, her first assignment of error is overruled.

## ASSIGNMENT OF ERROR II

"THE TRIAL COURT ERRED BY GRANTING PERMANENT CUSTODY OF [PWT] TO [CSB] BECAUSE ITS DETERMINATION THAT THE BEST INTERESTS OF THE MINOR CHILD WOULD BE SERVED BY [THE] GRANTING OF PERMANENT CUSTODY WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE."

{¶18} Mother next argues that the trial court's permanent custody decision was not supported by the evidence. Before a juvenile court may terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test that: (1) the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C.

2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, *In re William S.* (1996), 75 Ohio St.3d 95, 99.

{¶19} The trial court found that the first prong of the test had been satisfied because PWT had been in the temporary custody of CSB for well over 12 of the prior 22 months at the time CSB filed its motion for permanent custody and Mother does not challenge that finding. Instead, she maintains that the evidence did not support the trial court's conclusion that permanent custody was in the best interest of PWT.

{¶20} When determining whether a grant of permanent custody is in the children's best interests, the juvenile court must consider the following factors:

"(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

"(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

"(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period ***;

"(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)(a)-(d).[1]

{¶21} Mother's interaction with PWT during this case was limited to supervised visits at the visitation center. Because Mother had a history of making unfounded allegations of abuse against service providers, including one of the case aides in this case, CSB decided to record the visits between Mother and PWT. CSB did not normally record visits in dependency cases and

---

[1] The factor set forth in R.C. 2151.414(D)(1)(e) is not relevant in this case.

apparently made the video recordings to protect itself against any further allegations by Mother. Because it had made recordings of the visits, however, the parties and the trial court agreed that the trial judge would review the recordings of several visits that were selected by both parties and the guardian ad litem.

{¶22} This was an unusual situation for the trial court and this Court, as well over seven full work days was required to view the videos in their entirety. Given the time constraints imposed on each court in permanent custody cases, each court's resources would have been better utilized if, rather than simply submitting numerous multiple-hour visits to be viewed in their entirety, each party had pointed the court to specific portions of those videos, with an explanation of what those portions would demonstrate. Due to the unique nature of this case and the fact that the trial court did review all of the recordings, however, this Court did also.

{¶23} Because the evidence of Mother's interaction with PWT was too extensive to set forth in full detail, this Court will summarize the evidence before the trial court, with an elaboration of a few specific examples of Mother's behavior. CSB's witnesses did not dispute that Mother loved PWT, came to visits regularly, was loving and affectionate with him, and that there was a bond between the two. The recordings further reveal that Mother always came to the visits with food, activities, and gifts for PWT, and both Mother and PWT appeared to enjoy seeing each other.

{¶24} Although CSB's witnesses faulted Mother for bringing too much food for PWT, it was apparent that she simply wanted him to have a variety of food and drink choices and did not force him to consume more food than he wanted. This Court must emphasize, as it has before, that children services agencies too often focus on relatively insignificant matters in these cases. CSB focused too much of its evidence on the quantity and type of food Mother brought to each

visit, how she dressed, and that her behavior was merely different from other parents, which had little bearing on her ability to provide a suitable home for PWT. Whether Mother was a suitable parent did not hinge on whether her behavior and appearance conformed to societal norms, absent a demonstration that her unusual behavior would have a negative impact on her child. See *In re M.O.*, 9th Dist. No. 25312, 2010-Ohio-5107, at ¶7 (emphasizing that "[t]he focus in [a dependency and neglect case] is on whether parental care is *adequate,* not whether it is *ideal.*").

{¶25} CSB did present substantial other evidence, however, to demonstrate that Mother's distorted perceptions of the world had a negative impact on PWT that was becoming more apparent as he grew older. Although Mother's interaction with PWT was sometimes appropriate, often it was not, particularly when she spoke to him. She rarely spoke to PWT at an age-appropriate level, but instead used complex language and spoke about subjects that he could not understand at his young age. More disturbing, however, was Mother's continual and increasing focus on injury, death, and her belief that the government and "bad people" were out to get them.

{¶26} By the time PWT was two and three years old, the interaction at the visits typically consisted of periods of sitting quietly watching a movie or playing a children's game on the computer; physically playing, such as by pretending to be animals or tossing a Frisbee; and quietly playing with toys, coloring, or reading children's stories.

{¶27} The movie-watching portion of the visit would encompass anywhere from 30 minutes to three hours of each weekly, four-hour visit. Because PWT apparently did not watch television at the foster home, he appeared to enjoy watching the movies and often asked Mother to put on another movie. PWT did not interact much with Mother while he watched the movies, but would eat lunch or sit quietly in her lap or next to her.

{¶28} Occasionally, Mother would make comments about what they were watching. Sometimes, her comments were age-appropriate, but many times they were not. For example, while they were watching an animated movie about penguins surfing, unprompted by anything that was happening in the movie, Mother told PWT that she did not surf because there are sharks in the water. She spoke extensively at that time about the fact that sharks have big teeth, that they will eat you, and that you will not see them coming from under the water. Mother then imitated a shark eating a person. PWT never asked Mother about sharks, but she continued to raise the issue of the danger of sharks at subsequent visits. She even brought a book about sharks to show PWT how big their teeth were and again talked about sharks eating people in the water.

{¶29} Mother raised similar inappropriate concerns during other children's movies and stories. She would talk in detail about the risk of injury and death in everything PWT did. While playing or doing crafts, Mother repeatedly warned him not to cut off his fingers with the scissors and spent minutes telling him how she was afraid of big scissors. While PWT was coloring with markers, Mother warned him that his skin could fall off if he got marker on his fingers. During another visit, she cautioned him that paper was dangerous because it has sharp edges.

{¶30} While PWT was eating, Mother often warned him of the dangers of choking on food or the straws and plastic utensils he was using. Rather than simply telling him to be careful, chew slowly, or stop running around, she would describe in detail how he could choke to death, sometimes in graphic terms and/or while physically pretending to die.

{¶31} During periods of more active play, Mother would allow and even encourage PWT to become rowdy and aggressive by rolling around on the floor, jumping on the furniture,

running around the room, and by kicking the Frisbee. Sometimes, after he was all riled up, Mother would caution him, in graphic details, about what could happen to him if he was not careful, demonstrating how he could break his back and what it would look like. She once spent minutes explaining and demonstrating to him that people die with their eyes opened and their bodies become stiff.

{¶32} Mother frequently raised the topic of death, telling PWT that when he dies he will be gone forever and will not be able to watch television or drink chocolate milk. She once told him that if he did not eat, he would die, and proceeded to describe how his body would eat itself from the inside out, listing his individual organs.

{¶33} Mother also communicated her paranoid and delusional thoughts to PWT through what she called "stories," which were usually about bad people who were out to get her or her children. Her stories were typically unrelated to anything they were doing or saying at the time. She sometimes told her stories when PWT asked her to read to him a book. From the videos submitted by the parties, it appears that Mother began regularly telling her stories to PWT in August 2010 and, over the next several months, the length and bizarre nature of the stories intensified. Most of the stories were incredible and even delusional, and included Mother ranting about the government lying to her, stealing her children, protecting people who had tried to kill her, and blocking her computer's internet signal. Even if the content of any of the stories had been true, such as her telling him about her own Mother abusing her as a child, the substance of many of her stories was frightening and completely inappropriate for a three-year-old child.

{¶34} Often in conjunction with her stories about bad people being out to get them, Mother told PWT to stay strong and that he must defend himself if he is attacked. At more than

one visit, she demonstrated specific self-defense techniques to him and once suggested that he might be attacked when he goes to school.

**{¶35}** By November 2010, most of what Mother said to PWT focused on death or otherwise reflected her paranoia that the government and other people were out to get her. More significantly, Mother was no longer simply ranting at PWT; he was beginning to engage in conversation with her about death and bad people. The video recordings of these conversations demonstrated that PWT was starting to understand and be negatively affected by the disturbing nature of what Mother was saying to him.

**{¶36}** For example, on November 4, PWT was admiring Mother's necklace and she repeatedly told him that he could have it when she dies. PWT responded in a concerned tone, "No, you're not gonna die." Mother told him matter-of-factly that everyone dies. PWT continued to question Mother and she told him that everyone dies because you cannot live forever.

**{¶37}** During the same visit, PWT began a discussion with Mother about the fictitious bad people about whom she had told him. He said to her, in a concerned manner, that when the "naughty guys at your house are dead," he could come back to her house. Mother then ranted on for several minutes about naughty guys being everywhere and that they sit in corporations and often wear uniforms and police officer badges.

**{¶38}** During the January 7, 2011 visit, while Mother was once again talking about the "bad guys," PWT said, "I know. The bad guys make you dead." Mother responded, "They do sometimes, don't they?" She immediately transitioned into another one of her stories about people being mean to her and getting her kicked out of school. Immediately after that story,

PWT said, "Then you can just stay at home and not go to school." Mother responded that she was still going to school, but at another school.

{¶39} Later during the same visit, Mother began talking to PWT about how to defend himself if he was attacked from behind. He proudly told Mother that he would hit the people with the toy bowling pin he was holding. Mother responded by repeatedly telling him that he must do "whatever it takes" to defend himself. After Mother stopped talking and started cleaning up the room, PWT continued to repeat that if the bad guys hit him, he would hit them and do "whatever it takes."

{¶40} During the January 14, 2011 visit, when Mother told PWT a story about her best friend attacking her, he was engaged in the conversation from the beginning. As soon as she started the story about the friend, PWT asked, "What is his name?" Mother responded that she could not tell anyone because the friend went crazy and his name is a secret. With PWT apparently listening to her every word, Mother went on and on about the friend who lost his mind and tried to choke her from behind and picked her up by her head. She explained in detail and demonstrated how she defended herself from his attack, including that she pretended to be dead and then hit him in the head and knocked him down. PWT interjected, "He fell down?" Mother responded affirmatively, explaining that the man almost went through the window. She continued her story by emphasizing that the friend will never hit her again, he was no longer her friend, and that people are crazy.

{¶41} A review of the video recordings revealed that, as predicted by the psychological experts, as PWT grew older, his interaction with Mother was being negatively impacted by her untreated mental illness. There was also evidence that he was having nightmares due to the frightening topics that Mother discussed with him. As the experts had explained, without

treatment, Mother was not able to control the content of her conversation and seemed unable to be directed away from her paranoid and delusional thoughts. This was apparent through her testimony at both the adjudication and permanent custody hearings, as her testimony focused on paranoid and delusional thoughts that CSB, the fathers of her other children, and others had either already raped or otherwise abused her or her children or were trying to do so. Mother also testified that she did not need counseling. Thus, despite Mother's love for PWT, given her refusal to seek mental health treatment, the first best interest factor weighed heavily against her.

{¶42} Because PWT was three and a half years old at the time of the hearing, the guardian ad litem spoke on his behalf and recommended permanent custody to CSB. He explained that, although he did not initially see a connection between Mother's untreated mental illness and her ability to parent PWT, by the time of the permanent custody hearing two years later, he did. He testified that, although Mother had the ability to love, feed, and provide other basic care for PWT, her paranoid and delusional "tirades" had started to cause emotional harm. The guardian was concerned that PWT was starting to understand the meaning of Mother's words and was having nightmares after some of the visits, noting that he had awoken after one nightmare, terrified that the "bad people" might know where he lived.

{¶43} By the time of the hearing, PWT had been living outside of Mother's custody in a temporary placement for well over two years and was in need of a legally secure permanent placement. Mother was not able to provide him with a suitable home and, given her refusal to seek treatment, would be unable to do so in the foreseeable future. The only relative suggested by Mother as a potential placement for PWT was her half-brother, who told CSB that he was not interested in having custody of the child. CSB also contacted PWT's father, who also did not want custody of PWT and could not recommend any relatives who would be willing to do so.

Therefore, the trial court reasonably concluded that a legally secure permanent placement could only be achieved by granting permanent custody to CSB.

{¶44} There was substantial evidence before the trial court to support its conclusion that permanent custody was in the best interest of PWT. The second assignment of error is overruled.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Wayne, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

DONNA J. CARR
FOR THE COURT

MOORE, J.
DICKINSON, J.
CONCUR

APPEARANCES:

CONRAD G. OLSON, Attorney at Law, for Appellant.

DANIEL R. LUTZ, Prosecuting Attorney, and LATECIA E. WILES, Assistant Prosecuting Attorney, for Appellee.

EDWARD EBERHART, Guardian ad Litem.