DECISION AND JOURNAL ENTRY
{¶ 1} Appellants, Letha C. ("Mother") and Harry C. ("Father"), appeal from a judgment of the Summit County Court of Common Pleas, Juvenile Division, that terminated their parental rights and placed two of their minor children in the permanent custody of Summit County Children Services Board ("CSB"). We affirm.
 {¶ 2} Mother and Father are the natural parents of four children. Their oldest child is an adult and their next oldest child is in the legal custody of relatives. The only children at issue in this appeal are B.C., born July 12, 1993, and A.C, born March 10, 1997.
 {¶ 3} CSB has a long history with this family, including two prior voluntary cases. On October 5, 2006, CSB filed this case, alleging that B.C. and A.C. were neglected and dependent children. The agency alleged, among other things, that the children were not attending school regularly, that the parents had failed to maintain a stable or sanitary home for the children, and that Mother suffered from mental health issues and had not been complying with her treatment *Page 2 
program. The case plan focused on these issues as well as the fact that both parents had a history of involvement with illegal drugs and other criminal activity. These were the same problems at issue in the family's prior cases with CSB.
 {¶ 4} Although the specific details of each parent's criminal involvement before or during this case are not clear from the record, when CSB filed its complaint in this case, both parents were on probation due to recent criminal convictions for drug offenses. Father eventually completed the requirements of his probation, but he never secured stable housing and he failed to comply with CSB's requirements for drug and alcohol screening. During the pendency of this case, Mother was involved in more criminal drug and theft offenses that led to additional convictions. As a result, Mother was incarcerated for substantial portions of the case planning period.
 {¶ 5} CSB eventually moved for permanent custody of B.C. and A.C. Following a hearing on the motion, the trial court found that the children had been in the temporary custody of CSB for more than 12 of the prior 22 months and that permanent custody was in their best interests. Consequently, the trial court terminated parental rights and placed B.C. and A.C. in the permanent custody of CSB. Mother and Father separately appealed and their appeals were later consolidated. Mother raises one assignment of error and Father raises two. Because Mother's assignment of error is similar to Father's first assignment of error, they will be addressed jointly.
 Mother's Assignment of Error "The trial court erred in finding that it was in the best interest of the children to be placed in the permanent custody of [CSB.]"
 Father's Assignment of Error I "The decision of the court to grant permanent custody of the children to [CSB] was against the manifest weight of the evidence and is not in the children's best interest." *Page 3 
 {¶ 6} Mother and Father each contend that the trial court's permanent custody decision was not supported by the evidence presented at the hearing. Before a juvenile court can terminate parental rights and award to a proper moving agency permanent custody of a child, it must find clear and convincing evidence of both prongs of the permanent custody test: (1) that the child is abandoned, orphaned, has been in the temporary custody of the agency for at least 12 months of the prior 22 months, or that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, based on an analysis under R.C. 2151.414(E); and (2) the grant of permanent custody to the agency is in the best interest of the child, based on an analysis under R.C. 2151.414(D). See R.C. 2151.414(B)(1) and 2151.414(B)(2); see, also, In re William S. (1996), 75 Ohio St.3d 95, 99.
 {¶ 7} The trial court found that the first prong of the permanent custody test was satisfied because both children had been in the temporary custody of CSB for more than 12 of the prior 22 months. Neither parent challenges that finding. Instead, they focus their arguments on the best interest prong of the permanent custody test.
 {¶ 8} When determining whether a grant of permanent custody is in the child's best interest, the juvenile court must consider the following factors:
 "(1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
 "(2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 "(3) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period ending on or after March 18, 1999; [and] *Page 4 
 "(4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency[.]" R.C. 2151.414(D)(1)-(4)[1].
 {¶ 9} Throughout the 19 months that this case was pending prior to the permanent custody hearing, the parents' interaction with their children was limited to supervised visits at the CSB visitation center. Mother was unable to attend the majority of the visits because she was incarcerated throughout most of this period. Although Father attended most of his scheduled visits with his daughters, and the visits went well, CSB never allowed him to have unsupervised visits or visits outside the visitation center. The continuing requirement that Father's visits be supervised was likely due his failure to comply with many of the requirements of the case plan, including that he obtain stable housing and demonstrate that he was maintaining sobriety by submitting regular urine samples for drug screening.
 {¶ 10} The children's wishes were expressed by the children themselves. The trial court conducted an in camera interview of B.C. and A.C., then ages fourteen and eleven years old. Each child indicated that she wanted to live with her parents. Other witnesses testified that the children had consistently told them that they wanted to go home to their parents, but they also explained that the children had expressed concern about their parents' ability to follow through with their reunification goals and provide a better home than they did before.
 {¶ 11} The guardian ad litem echoed the children's concerns. Although she believed that the children truly wanted to be with their parents, she had great concern about whether the parents could provide a suitable home without ongoing supervision by CSB. She emphasized the fact that the agency had been involved with this family again and again over the past many years *Page 5 
and that shortly after a case would be closed, new concerns would arise and another CSB case would be opened. She believed that permanent custody was in the children's best interests.
 {¶ 12} The custodial history of B.C. and A.C. included 19 months prior to the permanent custody hearing that the children had been in the temporary custody of CSB. During that period of time, while the parents should have been working toward reunification with their children, Mother had become involved with more criminal activity and had spent most of the case planning period incarcerated.
 {¶ 13} Father visited the children regularly and completed some of the requirements of the case plan. He had never secured stable housing, however, and when he moved from place to place, he did not keep CSB updated with his current address or phone number, despite repeated requests that he do so. Father also failed to submit urine samples for regular drug screening.
 {¶ 14} Prior to this case, the children had lived in their parents' custody for many years. For several of those years, however, the family had been continually involved with CSB. Since 2003, the family has had three different cases with CSB and the concerns of CSB have never changed. Then and now, the family has had problems with Mother's mental health issues and her failure to get ongoing treatment, both parents have long-standing problems with drug and alcohol abuse and other criminal activity, and the parents have failed to maintain stable housing or provide for other basic needs of their children. Both girls had problems in school that were exacerbated by their parents' failure to send them to school regularly. A.C. repeated the first grade twice because she missed so much school.
 {¶ 15} Mother had been diagnosed with anxiety, depression, ADHD, and had been prescribed medication by her psychiatrist. Several witnesses testified that they could see marked changes in Mother's behavior when she was not taking her medication because she would *Page 6 
become agitated very easily and yell at everyone. The children had also expressed concern about Mother's mental health and wanted her to "feel better." They also noticed a difference in their Mother's behavior when she was taking her medication because she would be calmer and not yell so much.
 {¶ 16} During her most recent incarceration, Mother was compliant with her treatment program and was taking her medication. Earlier during the course of the case plan, however, Mother apparently stopped taking her medication, lost contact with her in-home therapist and ceased counseling, and eventually was in legal trouble again. Mother had demonstrated to CSB over the years that she was not consistent in taking her medication, which was a major concern to CSB. Father testified that he could not do anything about Mother's failure to take her medication, but admitted that he had never talked to her about it.
 {¶ 17} Both parents had a history of involvement with drug and other illegal activity, but the details of their criminal histories are not clear from the record. Mother apparently continued to have involvement in criminal activity during the pendency of this case, which led to additional convictions and periods of incarceration. Neither parent had submitted urine samples for regular drug screening as required.
 {¶ 18} Apparently as part of their drug activity, the parents frequently allowed other unrelated adults to stay at their home for extended periods of time. One of the caseworkers testified that this was a "big problem" for these parents because they opened their home and exposed their children to people they barely knew, many of whom had criminal histories. Father had apparently admitted to one of the caseworkers that allowing so many strangers into their home was a problem, but he had done nothing to address this potential risk to his children. *Page 7 
 {¶ 19} The lives of B.C. and A.C. had been intertwined with these same concerns for at least the past five years. While living with their parents and being directly exposed to these problems, the children missed excessive amounts of school and both had academic and behavior problems. Mother had admitted that she had trouble controlling her children and setting boundaries for them.
 {¶ 20} After the children were removed from their parents' custody and placed in a more stable environment, they began attending school and counseling on a regular basis and their grades and behavior were improving. As the guardian ad litem explained, in a stable environment, she had seen a "tremendous improvement" in these children. She explained that she had seen them transform into "vibrant, intelligent" and "outspoken" children.
 {¶ 21} The children's need for a legally secure permanent placement was demonstrated by several witnesses. There was substantial testimony about the lack of structure and boundaries in the lives of B.C and A.C. for the many years that they lived with their parents and all of the behavioral and educational problems that had resulted. Both girls had been in counseling throughout this case. One of their therapists explained that they both need structure and supervision and that they had been improving considerably in a structured environment. The trial court reasonably concluded that B.C. and A.C. were in need of a legally secure permanent placement.
 {¶ 22} The evidence also demonstrated that neither parent could provide a permanent home for the children at this time. Mother had just been released from her most recent term of incarceration and neither parent had stable housing. Moreover, neither of them had demonstrated that they could maintain long-term sobriety. Although several relatives had expressed an initial interest in taking custody of B.C. and A.C, none of those potential *Page 8 
placements materialized, either because the relatives were not suitable or were no longer interested in providing a permanent home. Although one relative agreed to take one of the girls, CSB did not want to separate B.C. and A.C. because they are very close to each other and had always been together. Therefore, the trial court reasonably concluded that a legally secure permanent placement could be achieved only through a grant of permanent custody to CSB.
 {¶ 23} There was ample evidence before the trial court to support its conclusion that permanent custody was in the best interests of B.C. and A.C. Mother's sole assignment of error and Father's first assignment of error are overruled.
 Father's Assignment of Error II
"CSB failed to use reasonable efforts to reunite the family."
 {¶ 24} Father raises a second assignment of error, that CSB failed to use reasonable efforts to reunite this family. Father argues this assigned error jointly with his first assignment of error, however, and he fails to set forth any separate argument in support of it. See App. R. 16(A)(7). We need not reach the merits of assignments of error that are not separately argued in the appellant's brief. App. R. 12(A)(2).
 {¶ 25} Moreover, this Court has held that, although CSB is required to prove that it put forth reasonable efforts toward reunification, R.C. 2151.419 requires it to do so at several stages of the proceedings, but not at the permanent custody hearing. See In re K.H., 9th Dist. No. 22765, 2005-Ohio-6323, at ¶ 9-10. The Ohio Supreme Court has agreed with that interpretation of R.C. 2151.419. See In re C.F., 113 Ohio St.3d 73,2007-Ohio-1104, at ¶ 41-43.
 {¶ 26} The trial court made prior findings in this case that CSB had exerted reasonable efforts toward reunification. Because the record fails to include transcripts of the hearings at *Page 9 
which the relevant evidence was presented, however, we must presume propriety of the reasonable efforts findings. Therefore, Father's second assignment of error is overruled.
 {¶ 27} The assignments of error are overruled and the judgment of the Summit County Court of Common Pleas, Juvenile Division, is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellant.
WHITMORE, J. CONCURS.
[1] The factor set forth in R.C. 2151.414(D)(5) is not relevant in this case. *Page 10